# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CODY BARNETT, WILLIAM BENNET, CHRISTOPHER BROWN, JESSE CALLINS, GREGORY DUNNING, BERNARD FRANKLIN, RICARDO GONZALES GUERRA, HEATHER LEWIS, ROBERT MORRILL, SAMUEL PAULK, HELEN PICIACCHI, DARIUS WALKER GREAVES and TODD WATSON, *on their own and on behalf of a class of similarly situated persons*, | Case No. 20-cv--- **Class Action** **PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** **IMMEDIATE RELIEF SOUGHT** |
| *Plaintiffs/Petitioners*, | |
| DISABILITY RIGHTS FLORIDA, INC., | |
| *Plaintiff*, | |
| v. | |
| GREGORY TONY, *in his official capacity as Sheriff of Broward County*, | |
| *Defendant/Respondent.* | |

## INTRODUCTION

1.     We are in the midst of the most significant pandemic in generations.[1]  A highly

contagious and deadly virus called coronavirus has swept the globe, and the disease caused by this

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, N.Y. TIMES, (Mar. 17, 2020), https://cutt.ly/PtQ5uAZ (opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

virus, COVID-19, has killed hundreds of thousands of people worldwide this year.[2]  People of all ages have contracted the disease,[3] and the World Health Organization estimates that one in five people who do will require hospitalization.[4]

2.        On March 13, 2020, the President declared a national state of emergency.[5]  Since at least March 26, 2020, the United States has led the world in confirmed cases of COVID-19, with over 1.86 million cases as of June 4, 2020.[6]  The virus continues to spread exponentially:  in the five-week period from April 26 to June 4, the number of confirmed coronavirus-related deaths doubled in the U.S., from around 49,000 to over 107,000.[7]  In Florida, as of June 4, there are over 60,100 total confirmed cases and over 2,600 deaths as a result of the disease.[8]  The number of new confirmed cases continues to be high, over 1,300 per day.[9]  More than half of new deaths come from South Florida.[10]

3.        There is currently no vaccine or even an effective treatment for COVID-19.[11]  The coronavirus spreads aggressively, and people can spread it even if they do not feel sick or exhibit

---

[2] As of June 4, 2020, there were 6,542,851 confirmed cases globally, with 386,581 deaths.  *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, JOHNS HOPKINS U. MED. (accessed June 4, 2020), https://cutt.ly/ryVarEx.

[3] Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis*, 20 LANCET INFECTIOUS DISEASES 669, 673 (Mar. 30, 2020).

[4] *Q&A on Coronaviruses (COVID-19)*, WORLD HEALTH ORG. (Apr. 17, 2020), https://cutt.ly/YtEyrxl.

[5] Derek Hawkins et al., *Trump Declares Coronavirus Outbreak a National Emergency*, WASH. POST (Mar. 13, 2020, 10:46 AM), https://cutt.ly/ftWyIPb.

[6] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, N.Y. TIMES (Mar. 26, 2020), https://cutt.ly/QtQ7zz6; JOHNS HOPKINS, *supra* note 2.

[7] JOHNS HOPKINS, *supra* note 2 (as of June 4, 2020, the US has 1,852,561 confirmed COVID-19 cases, the most of any country).

[8] *What You Need To Know About COVID-19 in Florida*, FLA. DEP'T HEALTH (updated June 4, 2020), https://cutt.ly/nyVkGBp. Of the 2,607 COVID-19 related deaths in Florida, 1,591 occurred in Miami Dade, Broward, Palm Beach, Lee, Hendry, Collier, and Monroe counties.  JOHNS HOPKINS, *supra* note 2.

[9] Michelle Marchante, *Florida Coronavirus Cases Surge Past 58,700, the Biggest Daily Gain in Six Weeks,* MIAMI HERALD (June 3, 2020), https://cutt.ly/iyVfcmm.

[10] *Id.*

[11] *Coronavirus*, WORLD HEALTH ORG. (accessed June 4, 2020), https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19.").

any symptoms.[12]   Consequently, public health authorities have exhorted American citizens and institutions—from schools[13] to places of worship[14] to legislatures[15]— to adopt a variety of risk-reduction measures in hopes of keeping the spread at bay.  One of the key strategies is to maximize social distancing where possible—maintaining at least six feet from one another.[16]  Public health authorities have also advised Americans to wear masks when venturing out, to undertake aggressive sanitation measures, such as cleaning and disinfecting all common surfaces with products with particular alcohol contents, and to close off any areas used by a sick person.[17]  Additionally, public health authorities have emphasized the necessity of medically isolating persons infected with COVID-19, persons who have come into contact with other who have been infected, and of those experiencing COVID-19 symptoms.

4.      Authorities in Florida have likewise responded to this crisis, including via (i) the Florida Governor's order requiring all persons in Florida to "limit their personal interactions outside the home",[18] (ii) the shelter-in-place, safer at home emergency order issued by Broward County requiring, among other things, that persons outside their homes must "continue to adhere

---

[12] *Coronavirus Disease 2019 (COVID-19): HowCOVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 4, 2020), https://cutt.ly/CtYRkkC.
[13] *Coronavirus Disease 2019 (COVID-19): Guidance for Schools and Child Care*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 4, 2020), https://cutt.ly/ItRPq5n.
[14] *Coronavirus Disease 2019 (COVID-19): Interim Guidance for Communities of Faith*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 4, 2020), https://cutt.ly/KtRPk1k.
[15] *Coronavirus and State Legislatures in the News*, NAT'L CONF. STATE LEGISLATURES (June 2, 2020), https://cutt.ly/4tRPQne.
[16] *Coronavirus Disease 2019 (COVID-19): Social Distancing*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 4, 2020), https://cutt.ly/nyVgh5j.
[17] *Coronavirus Disease 2019 (COVID-19): Cleaning and Disinfecting Your Facility*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 4, 2020), https://cutt.ly/syVgmfB.
[18] Fla. Exec. Order No. 20-112 (Apr. 29, 2020), as extended and modified by Fla. Exec. Order No. 20-120 (May, 9, 2020), Fla. Exec. Order No. 20-123 (May 15, 2020), and Fla. Exec. Order No. 20-131 (May 22, 2020), and Fla. Exec. Order No. 20-139 (June 3, 2020).

to the guidelines from the [CDC]" regarding social distancing,[19] (iii) and the Florida Department of Health's issuance, at the direction of the Governor,[20] of a public health advisory that individuals with underlying medical conditions and those over 65 years old "limit[] contact with all persons outside of the home and distanc[e] any unavoidable contact by a minimum of six feet," wash hands or use hand sanitizer frequently and disinfect high-touch surfaces.[21]

5.     Unlike the non-incarcerated population, incarcerated and detained persons are not free to take those measures that can best protect themselves from COVID-19.  A prisoner cannot choose where to sleep, where to shower, when they are transferred to another cell, or another facility, or how they are moved. A prisoner cannot buy or make their own mask. A prisoner cannot choose how to clean their own living quarters. And a prisoner cannot choose to be isolated, or create for themselves conditions that will allow them to socially distance from others.

6.     As a result, jails, like cruise ships and nursing homes, are at the eye of the COVID-19 storm.  For example, at the peak of the outbreak in Wuhan, China—the province where COVID-

---

[19] Broward County Administrator's Emergency Order No. 20-10 (May 14, 2020), available at https://cutt.ly/MyXuEPz; *see also* Broward County Administrator's Emergency Order No. 20-12 (May 21, 2020), Attachment 1 (requiring all establishments to ensure that employees practice social distancing of six feet), Attachment 2 (requiring restaurants to ensure customers remain at least six feet apart), Attachment 3 (requiring social distancing in retail establishments), Attachment 4 (requiring social distancing in personal services establishments), Attachment 5 (requiring automobiles to be spaced at least six feet apart at drive-in movie theatres), Attachment 6 (requiring exercise machines to be spaced at least six feet apart in fitness centers, gyms and community rooms), Attachment 8 (requiring social distancing in parks), Attachment 9 (requiring social distancing in accordance with CDC guidance at Marinas,  boat docks, ramps, and other launching venues), Attachment 10 (requiring social distancing on gold courses), Attachment 11 (requiring adherence with CDC social distancing guidelines on pool decks, at pools and other residential recreational amenities in housing developments), Attachment 12 (requiring social distancing at public community pools and private club pools); *Broward County Emergency Order 20-12 and 20-13 Frequently Asked Questions* (May 22, 2020), https://cutt.ly/PyVjwRN ("Whenever you are outside of your home, you should keep at least six feet between yourself and any person who does not live in your household.");  Broward County Administrator's Emergency Order No. 20-14 (May 29, 2020), Attachment 1 (requiring at least six feet between employees in all relevant establishments and that establishments "[v]isually mark required separation distances (six feet apart) for areas where there is any potential for people to congregate").
[20] Fla. Exec. Order No. 20-51.
[21] State of Florida Public Health Advisory Re: Protective Measures for Vulnerable Populations, Gathering of Private Citizens, and Density of the Workforce (Mar. 25, 2020), available at https://cutt.ly/EyVkgRt.

19 originated—over half of all reported COVID-19 cases were incarcerated or detained people.[22] In New York City, the epicenter of the COVID-19 pandemic in the United States, the rate of infection among detained/incarcerated people on the Rikers Island jail is over three times the rate of infection in New York City generally.[23]  In Florida, a prisoner is almost six times more likely to get COVID-19 than someone in the general population.[24]

7.     In light of these facts, it is imperative that our jails, and those with authority over them, take every step possible to reduce risks for prisoners, who in so many ways cannot take these essential protective measures for themselves.

8.     Incomprehensibly, while Broward County correctional facilities claim to be following CDC guidelines to contain the virus, they actually have not instituted even the most basic safeguards for prisoners and staff.  Known conditions across the four Broward County correctional facilities include those that can unnecessarily exacerbate the risk of infection and serious illness or death, particularly for the medically vulnerable:

- as of May 27, 2020, 52 confirmed cases (with only 216 prisoners tested) in the last two months in Broward County Jail facilities;

- no COVID-19 testing or screening of detainees at intake and inadequate testing and screening during detention, including of those whose medical vulnerabilities make

---

[22] Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, DIPLOMAT (Mar. 9, 2020), https://cutt.ly/qyVzmWE.

[23] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. *See Analysis of COVID-19 Infection Rate in NYC Jails*, LEGAL AID SOC'Y (May 27, 2020), https://cutt.ly/RtYTbWd.

[24] As of June 3, in Florida overall, there are 27 COVID-19 cases per 10,000 people.  *Florida Coronavirus Map and Case Count*, N.Y. TIMES (June 4, 2020), https://cutt.ly/zyVzoaw.  As of June 2, in Florida's prisons, there are 156 COVID-19 cases per 10,000 prisoners.  Katie Park, et al., *A State-by-State Look at Coronavirus in Prisons*, MARSHALL PROJECT (June 2, 2020), https://cutt.ly/UyVzdIx.

them especially at risk for severe illness or death if they contract the virus, of those with symptoms, or of those who were in close contact with individuals who test positive for COVID-19;

- inadequate COVID-19 testing or adequate screening of staff, resulting in staff who are in close contact with individuals who test positive for COVID-19 continuing to work and interact with detainees and other staff;

- inadequate protections for medically vulnerable prisoners, including continued exposure to other prisoners;

- failure to medically isolate detainees with symptoms, positive tests, or those exposed to someone with COVID-19, and failure to separate detainees who have tested positive from those who have only potential cases of COVID-19;

- a lack of restrictions on detainee movement, both internally and as a result of transfers from other facilities;

- failure to institute appropriate social distancing practices in dormitory bunk arrangements, medical areas, dayrooms, waiting lines, holding cells and other locations that are part of the booking process, restroom facilities, staff-initiated gatherings, and meals;

- inadequate cleaning, hygiene, decontamination and disinfecting supplies and procedures, both for detainees and staff;

- provision of inadequate and detainees personal protective equipment ("PPE") to staff and detainees and failure to mandate the use and regular replacement of such equipment, particularly equipment designed for single use (such as single-use disposable surgical masks);

- failure to train staff and detainees on proper use and decontamination of certain PPE so as to ensure its efficacy;

- failure to provide detainees with adequate PPE; and

- failure to timely and adequately educate detainees about the virus and prevention methods.

9. Preventing the Broward County Jail outbreak from growing worse not only will protect those who live and work at the jail, but will also protect the community at large. Jails are not hermetically sealed. Every day, custody, health care and civilian staff who have direct contact with prisoners enter and leave the facilities. For this reason, failing to prevent and mitigate the spread of COVID-19 endangers not only those within the institution, but the entire community. This danger has become more acute as Florida, and Broward County, have begun reopening—with social distancing and capacity restrictions—restaurants, beaches, gyms and other businesses, increasing the risk of community spread.[25] Hence, Broward County Sheriff Gregory Tony must take immediate and aggressive action in accordance with public health guidance, to prevent the outbreak from at the jail and its neighboring communities.

10. Absent intervention from this Court to align the operation of Broward County Jails with public health principles—first and foremost, through the release of as many medically-vulnerable detainees as feasible, but also through improved housing, testing, treatment, education, and sanitation protocols for all others—devastating, and in many cases deadly, irreparable harm will befall detained persons, jail staff, and the community.[26] The dramatic outbreaks in detention

---

[25] Fla. Exec. Order No. 20-139 (June 3, 2020).
[26] *See* Sandra E. Garcia, *U.S. Prison Population Remained Stable as Pandemic Grew*, N.Y. TIMES (May 14, 2020), https://cutt.ly/VyVvEwu.

facilities around the country prove the need for immediate and significant reductions in jail populations and other public health interventions.[27]   Courts and executive branch officials elsewhere in the country have accepted this reality and begun adopting processes for releasing detainees.[28]

11.     Accordingly, Plaintiffs—classes of persons incarcerated at Broward County Jails—bring this action and request (i) an immediate end to their unconstitutional conditions of confinement, and (ii) immediate adoption of a process to release all medically-vulnerable detainees, coupled with appropriate support and conditions upon release, as informed by public health and public safety expertise.  Given the exponential spread of COVID-19, there is no time to spare.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this putative class action pursuant to 42 U.S.C. § 1983 and 22 U.S.C. § 2241 for relief from both conditions of confinement and detention that violate their Eighth and Fourteenth Amendment rights under the U.S. Constitution and pursuant to 42 U.S.C. § 12131 *et seq.* and 29 U.S.C. § 794 for relief from disability discrimination.

13.     This Court has subject matter jurisdiction over these claims pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2241, 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. § 1331 (federal question jurisdiction).

14.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because Plaintiffs and all other class members are in custody in this judicial district and venue.

---

[27] *See* Park, *supra* note 24.
[28] *See Responses to the COVID-19 Pandemic*, PRISON POL'Y INST. (last updated June 3, 2020), https://cutt.ly/HyVbrao (citing over 100 instances of jails and prisons in the United States releasing people in response to the COVID-19 pandemic).

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

**A.  Plaintiffs**

15.     Plaintiff Christopher Brown is currently detained at the Joseph V. Conte Detention Center ("Conte Facility"), in Unit B4, of the Broward County Jail.  He is 59 years old. He has high blood pressure, stage 4 cirrhosis of the liver, problems with a heart valve and is currently receiving medication for his heart issues.  He was arrested on February 4, 2020, and is awaiting trial.  Mr. Brown's age and health conditions place him at a significant risk of severe illness and death should he contract COVID-19.

16.     Mr. Brown has not been tested for COVID-19.  He shares a small cell, which has only three bunk beds, with four other cellmates.  Mr. Brown cannot consistently socially distance in his unit due to the conditions under which he is held there.  The cellmates share a sink and toilet in the cell, where they also eat their meals.  In April, Mr. Brown was informed that at least three people in his unit tested positive for COVID-19, all of whom he was in regular contact with in the dayroom—a common area shared by all prisoners in the unit.  Staff told Mr. Brown that he has not been tested because he has not had a fever with a sufficient temperature.  The dayroom usually holds about 30 people at a time during the day, with about 15 chairs, electronic kiosks less than two feet apart, and prisoners and staff regularly closer together than six feet.  In the third week of May, 13 new people were brought into Unit B4, including two new prisoners placed in Mr. Brown's cell.  Mr. Brown is an individual with a disability for purposes of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  Mr. Brown is a member of the Pre-Adjudication Class (as defined below) and both Subclasses (as defined below).

17.     Plaintiff Bernard Franklin is currently detained in Unit 7A of the Conte Facility. He is 61 years old.  He is HIV positive and has AIDS.  Mr. Franklin cannot consistently socially distance in his unit due to the conditions under which he is held there.  Mr. Franklin was arrested on March 27, 2020.  Mr. Franklin's age and health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Franklin has not been tested for COVID-19.  Mr. Franklin resides in an open bay unit with 16 6-men cells—there are no walls or doors in the facility separating cells.  The unit houses both medically vulnerable prisoners such as Mr. Franklin and non-medically vulnerable prisoners.  He shares a cell with two other prisoners and when they are in the cell they are all less than three feet apart from each other. The approximately 45 prisoners in his unit continue to share a dayroom with multiple tables, a kiosk, three phones, two visitation screens, and a television, which are all close together.  Even though his unit has been on lockdown since mid-April, twelve prisoners are allowed out in the dayroom at a time, making social distancing is impossible and the guards do not attempt to impose any type of social distancing.  Mr. Franklin has only received two facemasks since mid-April.  Prisoners in his unit are responsible for cleaning their own cells, though they are not required to clean them daily.  He and the other prisoners in his unit are given the same cleaning supplies that the trustees use to clean the day room, so the buckets for cleaning are filled with dirty water by the time the prisoners can use them to clean their cells.

18.     On April 21, 2020, officers corralled all thirty-four of the prisoners then housed in Mr. Franklin's unit in a recreation yard less than half the size of a basketball court so that they could search the prisoners' cells.  On April 22, 2020, five prisoners from Mr. Franklin's unit were removed when the nurse on a sick call found they had fevers.  Mr. Franklin is a member of the Pre-Adjudication Class and the Medically Vulnerable Subclass.

-10-

19.     Plaintiff Cody Barnett is currently detained in Unit A8 of the Conte facility.  He is 32 years old.  He is HIV positive.  Mr. Barnett cannot consistently socially distance in his unit due to the conditions under which he is held there.  He was booked into the Main jail on April 5, 2020, before being transferred to the Conte facility 17 days later, where he now awaits trial.  At booking, Mr. Barnett was not asked if he had any COVID-19 symptoms or otherwise screened for COVID-19, was not given a mask during booking, despite that social distancing was not being enforced, and was not given information about how to protect against COVID-19.  Despite telling nurses in the Main Jail (including immediately upon booking) and the Conte facility that he had HIV and needed his medication, Mr. Barnett was not provided with his HIV medication for a month after he was booked.  Mr. Barnett's health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Barnett is an individual with a disability for purposes of the ADA and the Rehabilitation Act.  Mr. Barnett is a member of the Pre-Adjudication Class and both Subclasses.

20.     Mr. Barnett spent his first night at Main Jail in a holding cell with four or five other men, without even an arm's length of space between them.  The holding cell was dirty, as was the toilet and sink inside the cell.  None of the men were given a mask or gloves.  Mr. Barnett was transferred to multiple different rooms before appearing in front of a magistrate judge via video appearance, still having not been given a mask.  He was subsequently placed in transit dorms for 17 days.  Mr. Barnett's cell was about eight by seven feet, and he had two different cellmates while there.  Neither he nor his cellmates were given masks until Mr. Barnett's second week in transit dorms.  The masks were disposable and the inmates wore them improperly.  The common areas were cleaned for the first time during Mr. Barnett's second week as well, and still only once a day. The equipment in the common area was not cleaned between uses.  Inmates were allowed to clean

their cells once a day, but they all had to share the same cleaning materials, which got dirty after others used them.  People were cycled in and out of the transit dorms, despite its purpose of quarantining new inmates.

21.     On or around April 22, Mr. Barnett was taken to Conte on a bus with 20 other prisoners, handcuffed in pairs.  On arrival, he was put in cell B-3 with three or four cellmates.  The week of May 11, everyone was moved out of B-3, which was being turned into a quarantine unit. Mr. Barnett was moved to a cell in A-7 with one cellmate.  Everyone in A-7 shares 8 showers, and the toilet in his cell overflows.  Mr. Barnett's cellmate was coughing, but was not tested for COVID-19.  The cleaning supplies and practices are equally inadequate in A-7 as they were in B-3.  The first information he received about COVID-19 was via a loudspeaker announcement in mid-May.

22.     Plaintiff Robert Morrill is currently detained in Unit B2 of the Conte Facility.  He is 44 years old.  Mr. Morrill is HIV positive, and suffers from schizophrenia and bipolar disorder. He takes medication for all of these illnesses.  Before his arrest, Mr. Morrill suffered kidney failure and had been on dialysis.  Mr. Morrill cannot consistently socially distance in his unit due to the conditions under which he is held there.  Mr. Morrill's health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Morrill is an individual with a disability for purposes of the ADA and the Rehabilitation Act.  Mr. Morrill is a member of the Pre-Adjudication Class and both Subclasses.

23.     Mr. Morrill has four cellmates, who are never less than three feet apart.  The other cells in the unit are identical and similarly full.  Inmates are let out of their cells for one hour twice a day.  About 48 inmates are let out at a time, which makes it impossible to social distance in the common areas.  Recreation involves 48 inmates enclosed in a space the size of a half basketball

court.  Officers do not enforce social distancing, and inmates are rarely six feet apart.  In mid-April, the inmates in Unit B2 were first given disposable, single-use masks, without directions how to wear them.  Two trustees clean the unit and shared facilities and equipment twice a day, not between uses.  Prisoners are responsible for cleaning their own cells, which they are allowed to do once a day, using the same dirty cleaning products that were used by the trustees to clean the common areas.  Mr. Morrill gets two bars of soap a week, which he goes through very quickly, and cannot always get more when he runs out.  Neither he nor the other inmates in his unit receive liquid sanitizer or paper towels for hand-washing.  They receive one towel that gets laundered once a week.  Mr. Morrill was not given any information about COVID-19 until recently, when officers made some announcements over the PA about hand washing and keeping six feet apart.

24.     Plaintiff Ricardo Gonzales Guerra is currently detained in Unit 7A of the Conte Facility.  He is 64 years old.  Mr. Gonzales Guerra cannot consistently socially distance in his unit due to the conditions under which he is held there.  He was transferred to the Conte Facility on or around February 20, 2020.  Mr. Gonzales Guerra was diagnosed with Hepatitis C in 2008.  Mr. Gonzales Guerra also suffers from a heart condition involving a vein block and a thyroid condition.  Mr. Gonzales Guerra's age and health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Gonzales Guerra has not been tested for COVID-19.

25.     As of early May 2020, Mr. Gonzales Guerra lived in a small cell with five other cellmates.   During early May, one of Mr. Gonzales Guerra's cellmates exhibited multiple symptoms of COVID-19, including a severe cough.  Mr. Gonzales Guerra complained to jail officials that he was scared he had been exposed to COVID-19 because of his cellmate and was concerned because of his vulnerability (due to age and underlying medical conditions).  However,

-13-

Mr. Gonzales was not tested nor was he referred for any further medical examination.  He was not examined by medical staff until May 18, when he was seen for unrelated issues.  On May 19, Mr. Gonzales Guerra was transferred to another unit in the Conte Facility, where he shares a small  cell with another cellmate.  Mr. Guerra is an individual with a disability for purposes of the ADA and the Rehabilitation Act.  Mr. Gonzales Guerra is a member of the Post-Adjudication Class and both Subclasses.

26.     Plaintiff Jesse Callins is currently detained in Unit 7D1 of the Broward County Main Jail facility ("Main Jail").  He is 64 years old.  Mr. Callins cannot consistently socially distance in his unit due to the conditions under which he is held there.  Mr. Callins has schizophrenia and bipolar disorder, and is illiterate.  Before being transferred to Unit 7D1 earlier this year, he resided in the infirmary and the Henderson Psychiatric Unit before that.  Mr. Callins has been spitting up blood for the last month and suffering from night sweats and regular coughing and sneezing.  Mr. Callins has not been educated about COVID-19 and its symptoms or causes from any jail official since being in the Main Jail.  Mr. Callins lives in a unit with 13 other prisoners who share a common shower area that is cleaned once a day.  Mr. Callins is responsible for cleaning his own cell, but is provided only with a mop, once a day after it has been used in other cells, and no other cleaning supplies.  Mr. Callins' age and health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Callins is an individual with a disability for purposes of the ADA and the Rehabilitation Act.  Mr. Callins is a member of the Post-Adjudication Class and both Subclasses.

27.     Plaintiff Darius Walker Greaves is currently detained in Unit 5A3 of the Main Jail. He is 25 years old.  He has asthma and has recently been wheezing and suffering from shortness of breath.  Mr. Walker Greaves has not been tested for COVID-19.  Mr. Walker Greaves' health

conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Walker Greaves has not put in a sick-call to see a nurse as it costs $16 for every sick-call and he knows that a nurse would not be willing to test him for COVID-19 if he requested it at a sick-call.  Other than posting one small flyer in the unit, the nurses and officers have not provided him with information about COVID-19 or how to protect himself.  The unit that Mr. Walker Greaves is housed in is near capacity, and currently houses 27 prisoners.  During May of 2020 three new prisoners  moved into his unit.  He shares an 8 foot by 6 foot cell with another prisoner, where they sleep in a bunk bed and share a sink and toilet.  His unit has been on lockdown since April, but about 8 prisoners, including one trustee, are allowed out in the dayroom at a time.  The dayroom has tables, a kiosk, four phones, two visitation screens, and a television, all close together such that social distancing is impossible.  Mr. Walker Greaves is rarely ever six feet apart from other prisoners, either in his cell or in the dayroom.  Mr. Walker Greaves is a member of the Post-Adjudication Class and the Medically Vulnerable Subclasses.

28.     Plaintiff Todd Watson is currently detained in Unit 11B of the North Broward facility.  He is 56 years old.  Mr. Watson suffers from high blood pressure.  Mr. Watson cannot consistently socially distance in his unit due to the conditions under which he is held there.  Mr. Watson was arrested on March 17, 2020, at which point he was taken to the hospital before booking because of his high blood pressure.  While at the hospital, Mr. Watson had a fever of 100.4 degrees and complained of flu-like symptoms, and informed the doctors that he had recently been on a plane, but was not given a COVID test.  Hours later, after being released from the hospital, Mr. Watson complained about the same symptoms during the intake screening process at Main Jail, and informed the nurse during screening that he was concerned about having COVID-19, but was not tested at intake either.

29.     During intake, he was kept in a small holding cell with at least 15 other people, sitting shoulder to shoulder, for six hours.  After intake, Mr. Watson was handcuffed to another prisoner and transferred to a room on the second floor at the Main Jail, where he spent the night in a unit with approximately 24 other people while they waited for a hearing.  Mr. Watson was then handcuffed to another prisoner again and transferred to the fourth floor, where he spent a week and a half in Unit 4B2.  That unit was over capacity at the time and Mr. Watson slept for about a week and a half on a "boat" (a hard plastic shell holding a mattress) in the day room with up to six other people.  After he was informed that some prisoners had tested positive for COVID, Mr. Watson was then moved to Unit 5C2 in the Main facility.  He was subsequently transferred to Unit 11B in the North Broward facility where he is currently a detained prisoner.  Mr. Watson has never been tested for COVID.  Mr. Watson is a member of the Pre-Adjudication Class and both Subclasses.

30.     Plaintiff William Bennet is currently detained in Unit 5D at the Paul Rein Detention Facility ("Paul Rein") in the Broward County Jail.  Mr. Bennet is 68 years old.  Mr. Bennett cannot consistently socially distance in his unit due to the conditions under which he is held there.  Mr. Bennet suffers from chronic obstructive pulmonary disease, which requires him to use an inhaler twice day.  Mr. Bennet also uses a wheelchair, partially as a result of his recovery from throat cancer.  Mr. Bennet's age and health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Bennett has not been tested for COVID-19.

31.     Mr. Bennett's unit is an open bay facility that holds over 60 prisoners, where they are housed in low-walled "cubicles."  Mr. Bennet shares a "cubicle" with three cellmates, who sleep in two sets of bunk beds less than five feet apart from each other.  All the prisoners in the unit share the four toilets and four showers in the unit.  Mr. Bennet and his cellmates are provided

-16-

with cleaning supplies once a day to clean their cubicle, and given two small bars of soap a week. No hand sanitizer is allowed; nor are any disinfectants for the prisoners to use.  The 60 or so prisoners share a common dayroom that includes a few tables with chairs welded to them, eight phones, three visitation screens, and two kiosks.  The phones and visitation screens are less than two feet apart from each other and are used regularly by all prisoners.  Mr. Bennet is an individual with disabilities for purposes of the ADA and the Rehabilitation Act.  Mr. Bennet is a member of the Pre-Adjudication Class and both Subclasses.

32.     Plaintiff Heather Lewis is currently detained in Unit C9 of the Paul Rein facility. She is 52 years old.  She has Hepatitis C and asthma.  Ms. Lewis cannot consistently socially distance in her unit due to the conditions under which she is held there.  Ms. Lewis' lung was punctured in June 2019 during her arrest and she was hospitalized and put on a ventilator prior to being detained in jail.  She has been on breathing treatments ever since.  Ms. Lewis' age and health conditions place her at a significant risk of severe illness and death should she contract COVID-19. Ms. Lewis has not been tested for COVID-19.  Ms. Lewis has requested a test for COVID-19 but has been denied because she has been told she does not currently have any symptoms.  Her unit houses both medically vulnerable prisoners such as Ms. Lewis and non-medically vulnerable prisoners.  The trustees wipe down common surfaces in her unit approximately every eight hours. One of the trustees in her unit is "banded," meaning that she moves throughout the jail and outside the unit.  Ms. Lewis and other prisoners in her unit clean their own cells but are only given supplies every other morning.  All the prisoners in the unit use the same cleaning supplies and bucket of water to clean their cells.

33.     Ms. Lewis received her first mask in the last week of March and did not receive a new one for almost a month.  Since March, she has been given only three masks in total.  All 17

of the prisoners in her unit are allowed out in the dayroom in the morning together, and in the evening about half the prisoners are out in the dayroom in shifts.  The dayroom contains four telephones, two kiosks, a television and approximately 20 chairs, all of which are close together.  The dayroom also has a communal water fountain used by all of the prisoners.  Although social distancing could be possible in her unit's common areas and Ms. Lewis has attempted to social distance, the officers do not enforce any social distancing and the prisoners congregate close together in the dayroom to play cards and other games.  Ms. Lewis also has rheumatoid arthritis, but the doctor at the jail is no longer willing to give her the medication she needs for it.  The doctor told her that the protocol at the jail because of COVID-19 no longer permits him to give out such medication to prisoners.  Ms. Lewis is an individual with a disability for purposes of the ADA and the Rehabilitation Act.  Ms. Lewis is a member of the Pre-Adjudication Class and both Subclasses.

34.     Plaintiff Samuel Paulk is currently detained in Unit D2 at the Paul Rein facility.  He is 42 years old.  Mr. Paulk cannot consistently socially distance in his unit due to the conditions under which he is held there.  He has asthma, high blood pressure and diabetes for which he takes medication.  Mr. Paulk's health conditions place him at a significant risk of severe illness and death should he contract COVID-19.  Mr. Paulk has not been tested for COVID-19.  Mr. Paulk has been coughing and having difficulty breathing, but was unaware that those were symptoms of COVID-19 until he was recently told by his lawyer.  There are no flyers or other information posted in his unit about COVID-19, its symptoms or measures to prevent its spread.  Mr. Paulk has gotten most of his information from watching the news on television and the newspaper.  A prisoner in his unit who was having similar symptoms requested  a COVID-19 test but his request was declined. That prisoner was ultimately quarantined for three weeks for suspected COVID-19.  On May 6, 2020 a nurse told him that the jail "doesn't waste tests on prisoners" even if they are

suspected of having COVID-19.  Mr. Paulk was also told by a nurse that they would not even take his temperature unless he was put in a sick-call, which would cost him $7.  One of the officers in his unit, who was not showing any symptoms, took leave from work because he had COVID-19.

35.     Mr. Paulk's unit is at capacity, with 72 prisoners.  The facility actually combined prisoners from two units to fill his unit up to maximum capacity.  He shares his two-man cell, which contains a bunk bed, toilet, sink, table and stool, with one other prisoner who has only been in custody for about a month.  Although the unit is in lockdown, 15 prisoners at a time are allowed outside to play basketball and congregate in a small outdoor space of about 30 feet by 20 feet. Both in the dayroom and the outdoor recreation area, prisoners do not practice social distancing, nor do guards require it.  Recently, two new prisoners were brought into his unit who had been transported to prison with someone who tested positive for COVID-19.  The new prisoners were not quarantined or otherwise isolated from the unit when they arrived.  Mr. Paulk has received three single use masks since mid-April.  When prisoners' masks break, the officers don't replace them right away, so some prisoners have resorted to making their own masks from the sleeve of a shirt.  Mr. Paulk is a member of the Pre-Adjudication Class and the Medically Vulnerable Subclass.

36.     Plaintiff Helen Piciacchi is currently detained in Unit C9 of the Paul Rein facility.  Ms. Piciacchi is 59 years old.  Ms. Piciacchi cannot consistently socially distance in her unit due to the conditions under which she is held there.  She has low blood pressure and a history of liver problems.  She is legally disabled, with metal plates in her arms and legs, nerve damage in her left wrist, and limited function in her left hand.  Ms. Piciacchi currently suffers from severe stress and post-traumatic stress disorder.  Recently, she has been so nervous that she picks at her hands until they bleed.  Ms. Piciacchi resides in an open bay unit with 16 other prisoners—there are no walls or doors in the facility separating cells.  The unit houses both medically vulnerable

prisoners such as Ms. Piciacchi and non-medically vulnerable prisoners.  The prisoners share a dayroom.  While Ms. Piciacchi has attempted to social distance and keep herself isolated, officers do not try to enforce any social distancing requirements. The non-medically vulnerable prisoners often congregate together, and are not told to socially distance.

37.     While prisoners have all been given masks, many do not wear them, or do not wear them properly, and are not counselled to do so.   Ms. Piciacchi has been provided with three masks since the end of March, and no gloves.  Ms. Piciacchi is expected to clean her own cell, but is provided with a broom, mop, and cleaning solution only once every other day.  The trustees are responsible for cleaning common areas.  One of the trustees in Ms. Picacchi's unit is "banded"— meaning she regularly works outside the unit in other units, including doing sanitation, laundry, and cleaning units, exposing her (and thus Ms. Piciacchi's unit) to whatever is present in those other units.  Ms. Piciacchi has not been tested for COVID-19.  Ms. Piciacchi has asked to be tested for COVID-19, and staff have rejected each request because she has not exhibited sufficient symptoms.  Ms. Piciacchi is an individual with disabilities for purposes of the ADA and the Rehabilitation Act.  Ms. Piciacchi is a member of the Pre-Adjudication Class and both Subclasses.

38.     Plaintiff Gregory Dunning is currently detained at the North Broward Bureau, Broward County Jail ("North Broward"), in Unit 11B, of the Broward County Jail.  He is 51 years old.   He has high blood pressure, asthma, and knee pain.   He has been diagnosed with schizophrenia, depression, and suffers from panic and anxiety attacks.  These conditions make it difficult for him to concentrate and remember things, especially when under stress or pressure.  He was arrested on October 10, 2019, and is awaiting trial.  Mr. Dunning's age and health conditions place him at a significant risk of severe illness and death should he contract COVID-19.

39. Mr. Dunning has not been tested for COVID-19. He shares a small cell with one other prisoner, even though there is an empty cell in his unit. Mr. Dunning cannot consistently socially distance in his unit due to the conditions under which he is held there. He shares a sink and toilet with his cellmate. Guards do not enforce social distancing in the common area. New arrestees have been assigned to Mr. Dunning's unit without being medically quarantined or separated in any way. New prisoners have been assigned to Mr. Dunning's unit that have symptoms of COVID-19. One new prisoner was assigned to the cell next to Mr. Dunning's cell and was coughing for an entire week before he was removed. At one point during this week, the symptomatic prisoner lost his mask and was not given a new one, so he was coughing next to Mr. Dunning's cell without a mask. To treat his asthma, a nurse brings Mr. Dunning an inhaler twice a day. Mr. Dunning has witnessed the nurse who brings his inhaler go into other units where Mr. Dunning has heard there are positive COVID-19 cases. Mr. Dunning is an individual with a disability for purposes of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Mr. Dunning is a member of the Pre-Adjudication Class and both Subclasses.

40. Disability Rights Florida, Inc. ("DRF") is a not-for-profit corporation serving as Florida's federally-funded Protection and Advocacy Agency for individuals with disabilities, and serves as such by Executive Order signed by the Governor of Florida. As a Protection and Advocacy Agency, DRF has a congressional mandate to, among other things, "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services or habilitation." 42 U.S.C. § 15043(a)(2)(A)(i)f.

41. DRF has standing on behalf of its constituents and clients who are substantially affected by Defendant's noncompliance with constitutional and statutory protections because such

Case 0:20-cv-61113-WPD   Document 1   Entered on FLSD Docket 06/05/2020   Page 22 of 72

noncompliance falls within DRF's general scope of interest and activity. The relief requested—declaratory and injunctive—is the type of relief appropriate for DRF to receive on behalf of its individual constituents.

42.    DRF's constituents have suffered injury—and continue to suffer injury—that would allow them to have standing to sue in their own right. The interests DRF seeks to protect are germane to DRF's purpose.

## B. Defendant

43.    The Broward County Sheriff, Gregory Tony, is the Chief Correctional Officer for Broward County and is solely responsible, through the Broward Sheriff's Office ("BSO"), for the operation of the jails in Broward County, which include, but are not limited to, theMain Jail Bureau, Joseph V. Conte Facility, North Broward Bureau, and the Paul Rein Detention Facility (collectively, the "Broward County Jails"). Sheriff Tony is a final policymaker for running and administering the Broward County Jails. Sheriff Tony has immediate custody over Plaintiffs and all other putative class members. Sheriff Tony is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. COVID-19 Poses a Significant Risk of Illness, Injury, or Death

44.    The novel coronavirus that causes COVID-19 has led to a global pandemic.[29] As of June 4, 2020, there were more than 6,542,851 reported COVID-19 cases throughout the world and more than 1.86 million reported COVID-19 cases and 107,175 deaths in the United States.[30]

---

[29] *See* Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020), https://cutt.ly/UtEuSLC.
[30] JOHNS HOPKINS, *supra* note 2.

-22-

Projections indicate that as many as 240,000 people in the U.S. will die from COVID-19, accounting for existing interventions.[31]

45.     The Florida Department of Health, at the direction of Florida Governor Ron DeSantis, declared a Public Health Emergency for the state of Florida on March 1, 2020 to respond to the threat posed by COVID-19.[32]   On March 9, 2020 Governor DeSantis declared a state of emergency in Florida due to COVID-19, which he extended on May 8, 2020, and which is still in effect.[33]   On March 25, 2020, President Donald Trump declared that a major disaster exists in the State of Florida due to COVID-19.[34]

46.     Broward County declared a state of emergency on March 10, 2020 because "COVID-19 constitutes a clear and present threat to the health and welfare of the people of Broward County."[35]   Broward County renewed that Declaration of Emergency on March 17, March 24, March 31, April 7, April 14, April 21, April 28, May 5, May 12 and May 18 due to the continuing threat posed by COVID-19 to the health, safety and welfare of the people of Broward

---

[31] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, WASH. POST (Apr. 1, 2020), https://cutt.ly/5tYT7uo.

[32] FLA. DEPARTMENT OF HEALTH, STATE OF FLORIDA DEPARTMENT OF PUBLIC HEALTH DECLARATION OF PUBLIC HEALTH EMERGENCY (Mar. 1, 2020), available at https://cutt.ly/ayVQwh0.

[33] *Florida Department of Health Announces New Positive COVID-19 Case in Florida - Governor Ron DeSantis Issued Executive Order 20-52 Declaring a State of Emergency for COVID-19*, FLA. DEP'T HEALTH (Mar. 9, 2020), https://cutt.ly/8yVQiDj; FLA. EXEC. ORDER NO. 20-114 (EMERGENCY MANAGEMENT-EXTENSION OF EXECUTIVE ORDER 20-52-COVJD.19) (extending the state of emergency in the state of Florida for 60 days from May 8, 2020).

[34] Office of the President, *President Donald J. Trump Approves Florida Disaster Declaration* (Mar. 25, 2020), available at https://cutt.ly/dyVQbYb.

[35] BROWARD COUNTY COMMISSIONERS, DECLARATION OF EMERGENCY (Mar. 10, 2020), available at https://cutt.ly/WyVQDrX.

County.[36]  Additional Emergency Orders in Broward County were issued on May 21, and those orders were amended on May 22, and May 29.[37]

47.     The virus is known to spread mainly from person to person through respiratory droplets, close personal contact, but may also spread from contact with contaminated surfaces and objects.[38]  COVID-19 is thought to survive for a half-hour suspended in the air in droplet form, up to twenty-four hours on cardboard, and up to three days on stainless steel and plastic.[39]  There is no vaccine for COVID-19, and there is no known medication to prevent or treat infection.[40] Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[41]—and a vigilant hygiene regimen, including frequent hand-washing, use of alcohol-based hand sanitizers, frequent cleaning and disinfecting of any surfaces touched by any person, and the use of personal protective equipment ("PPE") such as masks, are the only known effective measures for protecting against transmission of COVID-19.[42]

48.     Researchers have found that a high percentage of individuals with COVID-19 are either a-symptomatic or pre-symptomatic—meaning they can rapidly unknowingly spread the virus to others before developing any symptoms themselves.[43]  Since COVID-19 spreads silently

---

[36] BROWARD COUNTY COMMISSIONERS, DECLARATION OF EMERGENCY (May 19, 2020), available at https://cutt.ly/RyVQXpa.

[37] BROWARD COUNTY ADMINISTRATOR'S EMERGENCY ORDER NO. 20-12 (May 21, 2020), BROWARD COUNTY ADMINISTRATOR'S EMERGENCY ORDER NO. 20-13 (May 22, 2020), BROWARD COUNTY ADMINISTRATOR'S EMERGENCY ORDER NO. 20-14 (May 29, 2020), available at https://cutt.ly/MyXuEPz.

[38] *Coronavirus Disease 2019 (COVID-19): Interim Infection Prevention and Control Recommendations for Patience with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 18, 2020), https://cutt.ly/ztRAo0X.

[39] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED. (Apr. 16, 2020).

[40] WORLD HEALTH ORG., *supra* note 11.

[41] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 16.

[42] *Coronavirus Disease 2019 (COVID-19): Protect Yourself*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 4, 2020), https://cutt.ly/GyVELfw.

[43] Roz Plater, *As Many as 80 Percent of People with COVID-19 Aren't Aware They Have the Virus*, HEALTHLINE (MAY 28, 2020), https://cutt.ly/uyVOSi7 ("In [a Journal of the American Medical Association] study, researchers reported that 42 percent of people who tested positive for COVID-19 were without symptoms.").

among people who do not show symptoms, universal testing to identify to COVID-19 infections early—even among individuals experiencing no symptoms—and medically isolating all individuals infected with COVID-19 is key to preventing COVID-19 from spreading. Absent such universal testing, because COVID-19 spreads mainly from person to person contact, staying away from people is the best way to prevent contraction and spread. In other words, *everyone*, including officials at Broward County's four jail facilities has to act as is if *everyone* has the disease.

49.     Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such as the heart and liver.[44]

50.     People who are 50 years of age and older face a greater risk of serious illness or death from COVID-19.[45] On February 28, 2020, a preliminary report showed that individuals age 50-59 had an overall mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[46]  In April, a study showed that rates of hospitalization for COVID-19 infections jumped significantly at age 50: while the hospitalization rate was 2.5% for adults aged 18-49, it was three times as high at 7.4%, for adults aged 50-64.[47] In New York City, the epicenter of the COVID-19 pandemic in the United States, the death rate for the population 45-64 is 185 per 100,000, more than nine times higher than the death rate of 20

---

[44] *See Coronavirus Disease 2019 (COVID-19): Clinical Care Guidance*, CTRS. FOR DISEASE CONTROL & PREVENTION (June 2, 2020), https://cutt.ly/etRPVRl.
[45] Xianxian Zhao, et al., *Incidence, Clinical Characteristics and Prognostic Factor of Patients with COVID-19: A Systematic Review and Meta-Analysis*, MEDRXIV (Mar. 20, 2020), https://cutt.ly/etRAkmt.
[46] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths*, WORLDOMETER (accessed June 4, 2020), https://cutt.ly/ytEimUQ (data analysis based on WHOChina Joint Mission Report).
[47] Shika Garg et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, 69 MORBIDITY & MORTALITY WKLY. R., 458, 459 (Apr. 17, 2020), available at https://cutt.ly/dyVT1tR.

per 100,000 for those 18-44.[48]  In turn, a higher level of care is necessary to address the risk of serious symptoms that accompanies the enormous hospitalization rate and higher overall mortality rate of individuals over 50—especially individuals over 50 in incarceration.  At an absolute minimum, individuals over 50 should be checked for COVID-19 symptoms on a daily basis, including daily temperature screening.

51.     People of any age who suffer from certain underlying medical conditions, many of which qualify as disabilities under the ADA and the Rehabilitation Act, face elevated risk.  Such conditions include lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes,  hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), developmental disorders, serious mental illness and moderate to severe asthma..[49]  Early reports estimate that the mortality rate was 13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[50]

---

[48] *COVID-19: Data*, N.Y.C DEP'T HEALTH (accessed June 4, 2020), https://cutt.ly/fyVYjBH.

[49] *Coronavirus disease (COVID-19) advice for the public: Myth Bsters*, WORLD HEALTH ORG., https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus."); *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, WORLD HEALTH ORG. (Feb. 28, 2020), https://cutt.ly/xtEokCt (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); *People Who Are at Higher Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 5, 2020), https://cutt.ly/tyVVKf9; Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), https://cutt.ly/LyVVZ8m (examining 5,700 persons hospitalized for COVID-19 and finding the most common comorbidities were hypertension (3,026; 56.6%), obesity (1,737; 41.7%), and diabetes (1,808; 33.8%)); *People with Developmental and Behavioral Disorders*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://cutt.ly/PyVVVkk ("Some people with developmental or behavioral disorders may have difficulties accessing information, understanding or practicing preventative measures, and communicating symptoms of illness.") CENTERS FOR DISEASE CONTROL, CS 316182-A, INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES (Mar. 27, 2020), https://cutt.ly/LyVWfed ("Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.").

[50] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, *supra* note 49.

52.     In serious cases, COVID-19 causes acute respiratory disease syndrome ("ARDS"), which is life-threatening: even with proper medical care, individuals with ARDS have a 30% mortality rate.[51]   And even in non-ARDS cases, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, cause permanent loss of breathing capacity.[52]   COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle.  Myocarditis can reduce the heart's ability to pump.[53]  This reduction can lead to rapid or abnormal heart rhythms in the short term, and heart failure limiting a person's capacity to work and exercise in the long term.

53.     COVID-19 can also trigger an over-response of the immune system and result in widespread damage to other organs, including permanent injury to the kidneys.[54]

54.     These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[55]

---

[51] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020) [hereinafter Letter from Faculty at Johns Hopkins], https://cutt.ly/stERiXk.

[52] Panagis Galiatsatos, *What Coronavirus Does to the Lungs*, JOHNS HOPKINS MED. (Apr. 13, 2020), https://cutt.ly/PyVsWxP.

[53] Erin Donnelly Michos, *Can Coronavirus Cause Heart Damage?*, JOHNS HOPKINS MED. (Apr. 24, 2020), https://cutt.ly/KyVsnmf.

[54] C. John Sperati, *Coronavirus:  Kidney Damage Caused by COVID-19*, JOHNS HOPKINS MED. (May 14, 2020), https://cutt.ly/EyVscWm.

[55] *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://cutt.ly/etRPVRl.

55.     Younger and healthier people are not immune.  Some who contract COVID-19 will have severe cases and require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[56]

56.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[57]  According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[58] For people in the highest risk populations, the mortality rate of COVID-19 infection is about 13.2 percent.

57.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[59]  At this early point, not all of the long-term effects of disease are known.

**B.  Incarcerated Persons Face Special Risks Due to COVID-19**

58.     Beyond the general public health risk presented by the COVID-19 pandemic, persons incarcerated at Broward County Jails and other correctional facilities face a particularly acute threat of infection, illness, permanent injury, and death.

---

[56] Lara S. Shekerdemian, Nabihah R, Mahmood, Katie K., et al., *Characteristics and Outcomes of Children with Coronavirus Disease 2019 (COVID-19) Infection Admitted to US and Canadian Pediatric Intensive Care Units*, JAMA PEDIATRICS (May 11, 2020).

[57] Lisa Lockerd Maragakis, *Coronavirus Disease 2019 vs. the Flu*, JOHNS HOPKINS MED. (updated June 2, 2020), https://cutt.ly/FyVdXWN.

[58] Rachael Rettner, *COVID-19 Is Killing 20 Times More People Per Week Than the Flu Does, New Paper Says*, LIVESCIENCE, (May 14, 2020 https://cutt.ly/8yVS5O9; Betsy McKay, *Coronavirus vs. Flu:  Which Virus is Deadlier?*, WALL STREET J. (Mar. 10, 2020), https://cutt.ly/itEmi8j.

[59] *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, *supra* note 55.

59.     As of June 4, 2020, there are 60,8183 confirmed cases of COVID-19 in Florida, with 7,462 confirmed cases in Broward County.[60]  As of the same date, there have been 2,607 confirmed deaths from COVID-19 in Florida, with 325 in Broward County.[61]  As of May 27, 2020, there were 52 documented cases of COVID-19 among detainees in Broward County Jails, and 106 documented cases of COVID-19 among BSO employees.  The true number is much likely higher given the limited and inadequate testing at the facility.

60.     As public health authorities and the CDC have recognized, people in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19.[62]  This is evidenced by the rapid spread of the virus on cruise ships[63] and in nursing homes.[64]  People who are confined in prisons, jails, and detention centers may not be able to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, due to the acts and omissions of their jailers.[65]  Prisoners typically live in small cells with multiple cellmates, who sleep on bunks within a few feet from one another and share toilets and sinks that they do not have cleaning supplies to sanitize.  Outside of those cells, prisoners are often required to shower within six feet of one another. Such conditions have caused

---

[60] *Florida COVID-19 Dashboard*, FLA. DEP'T OF HEALTH (accessed June 4, 2020), https://cutt.ly/7yVgURO.
[61] *Id.*
[62] *See COVID-19 Guidance for Shared or Congregate Housing*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 25, 2020), https://cutt.ly/kyVjLJq.
[63] The CDC is currently recommending that travelers defer cruise ship travel worldwide.  "Cruise passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19[.]"  *COVID-19 and Cruise Ship Travel*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://cutt.ly/7tEEQvT.
[64]  The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served.  *Preparing for COVID-19 in Nursing Homes*, CTRS. FOR DISEASE CONTROL & PREVENTION (updated May 19, 2020), https://cutt.ly/7tEEITH.  As of June 1, 2020, at least 26,000 nursing home residents had died from COVID-19 and more than 60,000 had tested positive for COVID-19.  *See* Ina Jaffe, *Nearly 26,000 Nursing Home Residents Have Died from COVID-19, Federal Data Show*, NPR (June 1, 2020), https://cutt.ly/4yVkhVV.
[65] *See* Matthew J. Akiyama, et al., *Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons*, NEW ENG. J. MED. (Apr. 2, 2020), https://cutt.ly/FyVkGRi (noting that "social distancing is extremely challenging in [correctional facility] settings").

dramatic outbreaks in, among other places, the Trousdale Turner Correctional Center in Hartsville, Tennessee,[66] the California Institution for Men in Chino, California, [67] the Cook County Jail[68] and Rikers Island in New York City, where the transmission rate for COVID-19 was for a time estimated to be the highest in the world.[69] The CDC also warns of "community spread," which occurs when the virus is transmitted easily and sustainably within a community.[70] Correctional settings further increase the risk of contracting COVID-19 due to the high number of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and difficulties in social distancing.[71]

61.     Correctional facilities typically house large groups of people together, and move people in groups to eat, recreate, and go to court.[72] They frequently have insufficient medical care for the population even outside times of crisis.[73] Hot water, soap, and paper towels are often in limited supply. Cleaning supplies with ingredients powerful enough to kill viruses, such as bleach and alcohol-based sanitizer, are often banned. Incarcerated people, rather than professional

---

[66] TENN. GOVERNOR'S OFFICE, COVID-19 UNIFIED COMMAND GROUP TO LAUNCH MASS TESTING STRATEGY OF STATE'S PRISON POPULATION AND STAFF—TROUSDALE TURNER CORRECTIONAL CENTER YIELDS 1,246 POSITIVE CASES (May 1, 2020), available at https://cutt.ly/dyVkNxs.

[67] *California Institution for Men Has 6th Virus-Related Death*, S.F. CHRON. (May 19, 2020),  https://cutt.ly/0yVzzj9.

[68] Sam Kelly, *134 Inmates at Cook County Jail Confirmed Positive for COVID-19*, CHI. SUN-TIMES (Mar. 30, 2020), https://cutt.ly/6tYTqi5.

[69] *See Analysis of COVID-19 Infection Rate in NYC Jails*, *supra* note 23.

[70] *Coronavirus Disease 2019 (COVID-19):  Public Health Recommendations for Community-Related Exposures*, CTRS. FOR DISEASE CONTROL & PREVENTION (last reviewed Mar. 30, 2020), https://cutt.ly/1yVcHEt.

[71] Letter from Faculty at Johns Hopkins, *supra* note 51; Akiyama et al., *supra* note 65. (noting that inmates in correctional facilities have "limited ability to protect themselves" from COVID-19 and that a number of factors increase the risk of poor outcomes for prisoners who contract COVID-19 infection).

[72] *See, e.g.*, Nathalie Baptiste, *Correctional Facilities Are the Perfect Incubators for the Coronavirus*, MOTHER JONES (Mar. 6, 2020), https://cutt.ly/GtRSi3e.

[73] *See, e.g.*, Steve Coll, *The Jail Health-Care Crisis*, NEW YORKER (Feb. 25, 2019), https://cutt.ly/ftERHNg.

cleaners, are responsible for cleaning the facilities.[74]  They are often not given appropriate supplies, and cannot clean frequently used areas—such as showers, toilets, sinks, and phones—between each use.

62.    Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, those incarcerated in jails and prisons suffered a disproportionately high number of cases.[75]

63.    Numerous public health experts, including Dr. Gregg Gonsalves,[76] Ross MacDonald,[77] Dr. Marc Stern,[78] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[79] Dr. Anne Spaulding,[80] Dr. Homer Venters,[81] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[82] and Josiah Rich[83] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

---

[74] *See, e.g.*, Wendy Sawyer, *How Much Do Incarcerated People Earn in Each State?*, PRISON POL'Y INITIATIVE, (Apr. 10, 2017), https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people); N.C. Dep't of Corr., *North Carolina Prison Inmates at Work*, available at https://cutt.ly/jtERCbb (noting that cleaning the grounds and facilities is one of the jobs of incarcerated persons in North Carolina).

[75] This H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher.  David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths Are Few*, PRISON LEGAL NEWS (Feb. 15, 2010), https://cutt.ly/ytRSkuX.  Unlike COVID-19, the H1N1 flu disproportionately infected and killed younger people— between the ages of 20 and 40—likely because elderly individuals had been exposed to a related H1N1 influenza virus in the late 1950s which conferred pre-existing immunity.  David Fishman, *Older Age and Reduced Likelihood of 2009 H1N1 Virus Infection*, NEW ENG. J. MED. (Nov. 12, 2009).

[76] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, CONN. MIRROR (Mar. 11, 2020), https://cutt.ly/WyVQqnN.

[77] Craig McCarthy & Natalie Musumeci, *Top Rikers Doctor:  Coronavirus 'Storm Is Coming,'* N.Y. POST (Mar.19, 2020), https://cutt.ly/ptRSnVo.

[78] Marc F. Stern, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* WASH. ASS'N SHERIFFS & POLICE CHIEFS (Mar. 5, 2020), available at https://cutt.ly/CyVQQS2.

[79] Oluwadamilola T. Oladeru, Adam Beckman & Gregg Gonsalves, *What COVID-19 Means for America's Incarcerated Population – And How To Ensure It's Not Left Behind*, HEALTH AFFAIRS (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[80] Anne C. Spaulding, *Coronavirus COVID-19 and the Correctional Facility*, EMORY CTR. FOR HEALTH INCARCERATED PERSONS (Mar. 9, 2020), available at https://cutt.ly/wyVQKRI.

[81] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jtRSPnk.

[82] Letter from Faculty at Johns Hopkins, *supra* note 51.

[83] Amanda Holpuch, *Calls Mount To Free Low-Risk US Inmates To Curb Coronavirus Impact on Prisons*, GUARDIAN (Mar. 13, 2020), https://cutt.ly/itRSDNH.

64. Because of the extraordinary risk of transmission of COVID-19 in jails and prisons, the CDC has issued specific guidance for dealing with correctional and detention facilities, including local jails (the "CDC Guidelines").[84] The initial CDC Guidelines were published on March 27, 2020, and acknowledge that incarcerated people are forced to exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced[,]" especially given that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants." In light of these concerns, the CDC Guidelines recommend that detention facilities "explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak." On May 6, 2020, after 86% of jurisdictions reported at least one laboratory-confirmed case of COVID-19 from a total of 420 correctional and detention facilities, the CDC published a report on COVID-19 in Correctional and Detention Facilities — United States, February–April 2020. The Report advises that "[p]rompt identification of COVID-19 cases and consistent application of prevention measures, such as symptom screening and quarantine, are critical to protecting incarcerated and detained persons and staff members" and provided further guidance to correctional and detention facilities.[85] The CDC Guidelines also recommend a number of steps that correctional facilities can take to at least somewhat mitigate the risk of the spread of the virus.[86] These include:

    a. Perform pre-intake screening and temperature checks for all new entrants, "enforce increased space between individuals" in waiting areas during intake,

---

[84] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49.
[85] Centers for Disease Control & Prevention, *COVID-19 in Correctional and Detention Facilities — United States, February–April 2020*, MORBIDITY & MORTALITY WKLY. REP. (May 6, 2020), https://cutt.ly/4yVWTOE.
[86] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49.

and "consider quarantining all new intakes for 14 days before they enter the facility's general population";

b.  Adopt and enforce social distancing strategies to increase space between individuals, including by rearranging bunking to ensure that beds are at a minimum six feet apart in all directions, increasing space in lines and waiting areas, staggering meals and rearranging seating so that detainees are sitting on only one side of the table and are separated with adequate space;

c.  Avoid unnecessary movements of inmates and staff, including by "rearrang[ing] scheduled movements to minimize mixing of individuals from different housing areas" and ""restricting movement in and out of the facility";

d.  Implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and "[e]nsure adequate supplies to support intensified cleaning and disinfection practices";

e.  "[E]nsure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms," including an evaluation "to determine whether COVID-19 testing is indicated";

f.  Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

g.  Ensure sufficient stocks of hygiene and cleaning supplies, no-cost access to soap (liquid soap where possible), including tissues; paper towels; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and

recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;

h. Provide "clear information" to inmates and staff about COVID-19, including by posting signage throughout the facility communicating COVID-19 symptoms, proper procedures for prisoners/staff experiencing symptoms, and hand hygiene instructions, educating inmates/staff about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions, and training staff on "the need to enforce social distancing and encourage hygiene precautions";

i. Medically isolate confirmed and suspected cases of COVID-19—as soon as an individual exhibits symptoms of COVID-19—and quarantine of contacts for 14 days;

j. Evaluate ill persons for underlying medical conditions that would increase their risk for severe illness from COVID-19 and "be especially mindful of cases who are at higher risk of severe illness from COVID-19."

65.     Around the country, prisons, jails, and detention centers have recognized the grave risks posed by COVID-19 to prisoners, staff, and the surrounding communities, and have implemented protective measures to address this risk.  Among the most important has been to offer universal testing to all prisoners and staff, so that infected persons can be medically isolated, treated, and removed from general population units where they can easily infect others. Equally

important, these correctional and detention facilities have released prisoners from custody to reduce overcrowding, with a focus on those who are most vulnerable to COVID-19.[87]

**C. Defendant Has Knowingly Failed to Adopt and Implement Adequate Policies and Procedures to Prevent and Mitigate the Spread of COVID-19.**

66.     Defendant Tony is well aware of the substantial risks his inadequate response to the corona virus, including his failure to follow CDC and public health guidelines, causes to the prisoners in his custody and care.  .  Though Defendant Tony and BSO have repeatedly acknowledged the severity of COVID-19 and claimed to follow CDC and public health guidelines, the Jail's facilities have systematically and continuously failed to do so. Defendant Tony has been repeatedly notified about the ongoing hazards and conditions of confinement that promote the spread of COVID-19 at the Jail, the particular and life-threatening risk those hazards and conditions pose to medically vulnerable persons confined at the Jail, and remedial actions he should take to address these risks.   He has disregarded these risks.

67.     As detailed above, the Florida Department of Health, the Governor of Florida and the President of the United States have issued repeated declarations acknowledging the deadly risks of COVID-19.  On April 7, 2020, Defendant Tony released a statement claiming that employees were following CDC Guidelines in response to COVID-19 concerns.  That same day, a Broward County prisoner died from COVID-19.[88]  On April 10, in response to a letter from the Broward County Public Defender's office, the General Counsel of the BSO released a letter claiming that it was following CDC Guidelines for screening as well as for informing prisoners

---

[87] *Responses to the COVID-19 Pandemic*, *supra* note 28 ("Jails and prisons house large numbers of people with chronic diseases and complex medical needs who are more vulnerable to COVID-19.").
[88] Amanda Batchelor & Ian Margol, *Inmate Diagnosed with Coronavirus Had Emergency Motion Filed for Release Prior to his Death*, Local10 (Apr. 9, 2020), https://cutt.ly/jyV1Oi4.

-35-

about COVID-19.   On April 24, 2020, Federation of Public Employees Safety Committee Department of Detention sent a letter to BSO, speaking on behalf of the corrections officers, complaining of conditions within the Broward County Jails that contribute to the risk of transmission of the virus, including, for example: (a) unnecessary non-emergency regular transferring of prisoners between facilities and across unites within individual facilities; (b) lack of adequate PPE for staff; (c) lack of information being shared with the staff about COVID-19 in the Broward County Jails; (d) lack of adequate uniform cleaning protocols for common spaces within Broward County Jails; and (e) failure to accommodate staff who have been exposed to COVID-19's requests for COVID-19 testing.   On May 11, 2020, Disability Rights Florida sent a letter to Defendant Tony and BSO, describing ongoing COVID-19 hazards at the Broward County Jails, and demanding he take certain actions to protect prisoners with disabilities from COVID-19.Yet, to this day, Broward County Jails have failed to implement policies and procedures to adequately address the risk of harm posed by COVID-19.   Defendant Tony's acts and omissions have placed prisoners in the Broward County Jails at a significant and unnecessary heightened risk of infection, severe illness, and/or death despite having received the above specific warnings of this risk and despite widespread knowledge of the highly contagious nature of COVID-19 and the severe consequences of infection, especially among older people and people with underlying health and medical conditions.

68.   Defendant Tony's failure to adopt and implement adequate policies and procedures was done knowingly and/or recklessly.   Those failures include the following:

***Hazardous Intake Processes and Conditions***.

69.   In any correctional facility, the booking area presents a high-risk area for the transmission of infectious diseases.   It is the area where newly arrested prisoners are first admitted

to the jail.  They may come into the facility already infected, and capable of infecting others. Therefore, it is critical that the booking area and process account for this risk of transmission of COVID-19.  The Broward County Jails describe the booking process as involving property intake, medical screening, fingerprinting, photographing, and warrants check, followed by an appearance in Magistrate Court the next day for prisoners who have not bonded out.[89]  Yet the BSO has instituted inadequate procedures  to minimize the risk of spread of COVID-19 during this booking process, when prisoners and staff are in close quarters for a significant duration of time.

70.     Defendant Tony and the Broward County Jails have not implemented adequate steps to require social distancing or otherwise minimize the spread of COVID-19 during the booking process.  Not surprisingly, prisoners report spending significant time, up to hours, waiting shoulder to shoulder with fellow prisoners in cramped holding areas at intake—all while provided neither personal protective equipment nor information or education as to how to socially distance or minimize the risk of spread.

71.     The CDC Guidelines lay out specific questioning that jails should use during this process.[90]  The CDC Guidelines also state that "if possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case)."[91]

72.     While the Broward County Jails have outlined a basic policy for intake screening (screening for fever, lower respiratory illness, cough, shortness of breath, recent travel to affected countries, and close contract to someone suspected or tested positive for COVID 19), the policy is

---

[89] *Additional Information – Intake & Release Process*, BROWARD SHERIFF'S OFF. (accessed June 4, 2020), https://cutt.ly/IyVTlud.
[90] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49.
[91] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49.

not specific about how screening should be conducted. Moreover, the policy does not cover the full range of symptoms associated with the virus, which also include tiredness, muscle aches, chills, loss of taste or smell, headache, or chest pain; as well as less common symptoms including rash, nausea, vomiting, and diarrhea.[92]  Moreover, Defendant Tony and the Broward County Jails are flouting the basic principle (encapsulated in public health and CDC Guidelines) to cohort new entrants for 14 days in order to minimize the risk of any introduction of the disease into the general population.

73.     Worse, notwithstanding these inadequate policies on screening, Broward County Jails routinely fail to perform even these basic pre-intake screening and temperature checks for new entrants.  Prisoners are often not asked if they have symptoms and have reported not having their temperature taken during initial booking or transfer to other facilities.  This failure to properly screen and cohort new entrants has continued well into the month of May, ***more than two months*** after the state of Florida and Broward County declared a state of emergency and nearly two months since the CDC issued guidance specifically directing such screening.

74.     Symptom screening alone is ineffective to identify all those who are newly booked and COVID-19 infected.  Up to one in three persons who are infected will be asymptomatic.  They are, however, capable of infecting others despite not having symptoms.  As newly admitted persons may be infected at the time of booking, but asymptomatic, they must be tested to reduce the risk of both their introducing infection into the Jail, and of being infected and in need of treatment.  Sheriff Tony has failed to institute testing for all newly admitted prisoners.

---

[92] *Coronavirus Disease 2019 (COVID-19) – Symptoms and Causes*, MAYO CLINIC (accessed June 4, 2020), https://cutt.ly/RyVTJFu; *Coronavirus Disease 2019 (COVID-19) – Symptoms of Coronavirus*, CTRS. FOR DISEASE CONTROL & PREVENTION (last reviewed May 13, 2020), https://cutt.ly/byVTCfo.

### *Insufficient Social Distancing*.

75.     The need for social distancing, and to remain at least six feet from other persons, is well understood.  The CDC Guidelines recommend:

- If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)

- Arrange bunks so that individuals sleep head to foot to increase the distance between them

- Rearrange scheduled movements to minimize mixing of individuals from different housing areas[.][93]

Remarkably, the Investigations and Projects Union (IPU) Bulletins (official policies distributed to jail staff) for COVID-19 do not provide any policy or guidance as to social distancing.

76.     Despite ubiquitous guidance as to the importance of social distancing, the BSO holds prisoners in conditions that prevent it.  Prisoners sleep in beds less than six feet from other prisoners, and sometimes sleep less than a few feet from one another.  Many prisoners eat their meals in their cells with other prisoners and share a toilet and sink.  It appears that prisoners are not being spread out to maximize social distancing.  Although the jail itself is at roughly 65% capacity overall, prisoners are nevertheless bunked together in units that are nearly full, completely full, or beyond capacity.  Many prisoners are in multiple-person cells holding up to six people.  Some are in bays that not only have multiple persons per cell, but the bays themselves are separated by low walls only.  Prisoners have been placed on extended lockdown in two-man cells, where they cannot protect themselves with social distancing while in their cells.  While social distancing

---

[93] *See id.*

is much more difficult in the jail setting, many of these conditions are imposed by the Sheriff and could be remedied.

77.     In addition, social distancing is not practiced in the common areas of the jail due to BSO's management of the housing units.  Prisoners frequently congregate together in groups in common areas where it is either impossible to social distance because of the numbers of prisoners who are in those units, space limitations and how furniture and amenities (kiosks, video modules, phone) are spaced, or where social distancing is not enforced by the staff.  As inmates have repeatedly observed, sergeants coming to the units require social distancing, but the regular staff do not.  Moreover, in large units, six to eight prisoners may be in the shared bathroom at the same time.

78.     Social distancing is also not practiced among staff members when interacting with other staff or when interacting with inmates.

79.     The BSO fails to effectuate proper social distance when transporting prisoners to different facilities, or placing them in common areas, such as the medical area and holding tanks.  As recently as May 20, 2020, 20 to 25 prisoners were crammed together in a single elevator while exiting the jail to be transferred and each prisoner was cuffed to another prisoner sitting in the same seat in the transfer vehicle.

80.     The BSO's prisoner movement practices, which fail to implement social distancing, increase the risk of facility-to-facility and unit-to-unit transmission.  This also includes "banded" trustees, who move from unit to unit within their facility.

81.     Notably, Defendant Tony could facilitate social distancing by spreading prisoners out more into currently unused cells, units or even facilities.  While some housing units are operating near, at, or even above capacity (with prisoners sleeping on mattresses in hard plastic

cells in unit dayroom floors), other units designated for prisoners of the same custody level are operating well below capacity. Moreover, there is a jail facility, which is not being used currently to house prisoners. In 2009, the Stockade, which housed 430 prisoners, was closed, reducing the number of Broward County Jail facilities from five to four.[94] In 2014, then-BSO Capt. Scott Russell acknowledged that the facility "could be easily reactivated for jail overflow."[95] According to the Broward County Commission's Housing Committee, "[t]he design of the stockade is to house the jail overflow, *especially during crisis or emergency needs*."[96] And, as Assistant County Administrator Alphonso Jefferson stated in an affidavit for another case, "[t]he Stockade is available as a contingency jail facility in the event more jail space is needed, as authorized by the Broward County Commission."[97] Although the Stockade could provide extra space to help facilitate the CDC and public health authority-recommended social distancing for Broward County prisoners and reduce the risk of spread of COVID-19 among the prison population and staff during this emergency, it is not being utilized during the COVID-19 pandemic to expand available bed space for the current jail population.

---

[94] Brittany Wallman, *Jail Wing Closing; Where Did the Inmates Go?*, SUN SENTINEL (June 1, 2010), https://cutt.ly/JyVSpnG.
[95] Brittany Wallman, *County Rejects Proposed Homeless Shelter at Stockade*, SUN SENTINEL (Mar. 11, 2015), https://cutt.ly/RyVSdnx.
[96] Broward Housing Counsel, Meeting Minutes (June 23, 2017), available at https://cutt.ly/xyVAiUE.
[97] Affidavit of Alphonso Jefferson, *George S. Jonas* v. *Edward E. Stack* et al., 76-cv-06086 (S.D. Fla. Aug. 31, 2015).



[98] Broward County Stockdale, https://rs.locationshub.com/location_detail.aspx?id=056-10059097&photopage=5 (accessed June 4, 2020).



82. Defendant Tony has not publicly sought to re-open this facility so it could be used to allow prisoners to protect themselves from COVID-19, and its potentially lethal consequences, by social distancing.

*Insufficient Testing.*

83.     Because individuals can spread COVID-19 to others before they experience any symptoms,[99] universal testing to identify to COVID-19 infections early—even among individuals experiencing no symptoms—and medically isolating all individuals infected with COVID-19 is essential to preventing COVID-19 from spreading.

84.     As of May 27, 2020, BSO has only tested 216 prisoners.  This represents less than 10% of the current population, and an even lower percentage of the total population that has been held at the jail since the pandemic began.  Broward County Jails have neither implemented adequate testing nor adopted adequate procedures to isolate confirmed and suspected cases. Testing has been delayed or denied, even to detainees with symptoms or who were in contact with confirmed cases.  Prisoners fear reprisal for asking to be tested or notifying staff that they have COVID-19 symptoms because prisoners have experienced retaliation for doing so.

85.     Broward County Jails have not only failed to provide staff with testing for COVID-19 after exposure to a prisoner who tested positive for COVID-19, they have forced staff to use their personal sick time to go and get tested in such circumstances.  The jail does not offer free testing to all staff members upon request.

86.     Other prison systems throughout the country have recognized the particular risks to prisoners and staff alike of COVID-19 spread and offered universal or mass testing of all prisoners

---

[99] Xi He, et al., *Temporal Dynamics in Viral Shedding and Transmissibility of COVID-19*, NATURE MED. (Apr. 15, 2020), available https://cutt.ly/zyVBAKQ (concluding that concluded that people with no symptoms are the source of 44 percent of diagnosed COVID-19 cases); Alvin J. Ing, et al., COVID-19: *In the Footsteps of Ernest Shackleton*, THORAX (May 27, 2020), available https://cutt.ly/LyVBHO5 (reporting that 104 of 128 people (81 percent) on a cruise ship who tested positive the novel coronavirus were asymptomatic); Rongrong Yang, et al., *Comparison of Clinical Characteristics of Patients with Asymptomatic vs Symptomatic Coronavirus Disease 2019 in Wuhan, China*, JAMA (May 27, 2020), available https://cutt.ly/8yVBMA7 (reporting that 42 percent of people who tested positive for COVID-19 were without symptoms).

in correctional facilities.[100] The results of their testing initiatives show the necessity of broad testing of all individuals in correctional facility environments, rather than just those presenting symptoms. The Tennessee Department of Corrections ("TDOC") began testing all prisoners and all staff on May 1, 2020.[101] The TDOC found that 98% of individual prisoners or staff who tested positive for COVID-19 were asymptomatic.[102] Similarly, when North Carolina's Neuse Correctional Institution instituted a policy of testing all prisoners, over 57% of the prisoners tested positive for COVID-19 and the Department of Public Safety found that the vast majority of prisoners infected with COVID-19 were asymptomatic or pre-symptomatic at the time of testing.[103] In Louisiana, two-thirds of the prisoners who tested positive for COVID-19 at the Elayn Hunt Correctional Center had no symptoms.[104] The Department of Rehabilitation and Corrections in Ohio ("Ohio DOC") began mass testing of prisoners in the state on April 11, 2020, resulting in 4,000 prisoners testing positive for COVID-19.[105] As in Tennessee, the Ohio DOC emphasized the importance of testing asymptomatic individuals, noting that "[b]ecause we are testing everyone – including those who are not showing symptoms - we are getting positive test results on individuals who otherwise would have never been tested because they were asymptomatic."[106] Testing based solely on the presentation of symptoms such as a fever likely misses the vast

---

[100] *These Prisons Are Doing Mass Testing For COVID-19—And Finding Mass Infections*, MARSHELL PROJECT (Apr. 24, 2020), https://cutt.ly/PyVALg2 (accessed on June 4, 2020).
[101] TENN. GOVERNOR'S OFFICE, *supra* note 66.
[102] *Id.*
[103] Jordan Wilkie, *NC Closes Prison, Sends Staff To Combat Neuse Outbreak*, CAROLINA PUB. PRESS (Apr. 21, 2020), https://cutt.ly/ayVA4S5.
[104] Associated Press, *At Louisiana Prison, 192 out of 195 Inmates Test Positive for COVID-19*, MARKETWATCH (May 5, 2020), https://cutt.ly/hyVA5K4.
[105] Josiah Bates, *Ohio Began Mass Testing Incarcerated People for COVID-19. The Results Paint a Bleak Picture for the U.S. Prison System*, TIME (Apr. 22, 2020), https://cutt.ly/gyVSwSh.
[106] *COVID-19 Inmate Testing*, OHIO DEP'T OF REHABILITATION & CORRECTION (updated Apr. 19, 2020), available https://cutt.ly/hyVSyBF.

majority of positive COVID-19 cases in correctional facilities, making it impossible to identify and thus isolate prisoners infected with COVID-19, or to initiate timely treatment for them.

87.     In its Report on COVID-19 in correctional facilities, the CDC emphasized that "symptom screening alone is inadequate to promptly identify and isolate infected persons in congregate settings such as correctional and detention facilities[,]" pointing to data from nursing homes which found the majority of those confirmed positive from "facility wide testing were among asymptomatic and pre-symptomatic persons, who likely contributed to transmission."[107] Accordingly, as testing becomes "more widely available" it also becomes  "an important strategy" for correctional facilities to use to prevent and limit COVID-19 transmission.[108]

88.     As of May 17, 2020, in Florida, "tests are averaging about half the statewide capacity of 30,000 per day."[109]  And according to Jared Moskowitz, director of Florida's Division of Emergency Management, despite the state's attempts to improve access in an attempt to have more people get tested, "less and less people are coming to these sites, and we've seen that decline in the numbers."  Even as recently as June 1, 2020, Florida "typically only [has] demand for about half" their testing capacity.[110]   As testing in Florida is becoming "more widely available," correctional facilities throughout Florida—including Broward County—must make use of this important strategy like multiple other prison systems throughout the country have.

---

[107] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49.
[108] *Id.*
[109] Steve Thompson, Juliet Eilperin & Brady Dennis, *As Coronavirus Testing Expands, a New Problem Arises: Not Enough People to Test*, WASH. POST (May 17, 2020), https://cutt.ly/jyVSlGg.
[110] John Kennedy, *As Second Month of Reopening Begins, Florida Coronavirus Testing Still Falls Short*, HERALD TRIBUNE (June 1, 2020), https://cutt.ly/zyVScrw.

### *Lack of Information and Education*.

89.      Public health authorities and the CDC have made clear that education of both staff and detainees is critical to help prevent the spread of COVID-19.  However, Broward County Jails have failed to provide the basic information about COVID-19 prevention recommended by the CDC and public health authorities to all detainees. Some of the Plaintiffs have been left to try to discover how to protect themselves from COVID-19 based on intermittently available news coverage. Some Plaintiffs had not received information from the Broward County Jails about COVID-19 even after they themselves had started to develop symptoms. This is the case even for medically vulnerable prisoners, who face a significantly increased risk of serious medical complications from exposure to COVID-19. Nor have Defendant Tony and BSO taken steps to ensure that prisoners with mental or intellectual disabilities are educated about the disease and able to take the steps necessary to protect themselves. In fact, a detainee who told a nurse he was feeling feverish, experiencing coughing and body aches was told that those were *not* symptoms of COVID-19.

### *Lack of Personal Protective Equipment (PPE) and Cleaning Supplies.*

90.      Contrary to public health authorities and the CDC's guidelines, Broward County Jails have failed to provide staff with adequate PPE and to require the use and regular replacement of such equipment. They have likewise failed to train both staff and detainees how to adequately use PPE.

91.      Detainees are generally denied access to adequate PPE, even upon request. Most detainees did not begin to receive masks until near mid-April, but were not trained how to effectively use their masks upon receipt and some have never been trained how to do so. Moreover, the masks distributed to detainees are meant to be single use—in addition to being

flimsy and prone to breaking—but detainees are expected to reuse the same single use mask day after day and cannot receive a replacement if broken. Many prisoners have to reuse the same one-time use masks for two weeks or even a month. Prisoners also are not being given gloves.

92.     The CDC Guidelines also recommend[111] that jails consider relaxing their normal bans on alcohol-based hand sanitizer, given the general CDC recommendation that hand sanitizer be used to help prevent the spread of COVID-19. Notwithstanding this recommendation, Defendant Tony and Broward County Jails continue to deny prisoners the ability to use alcohol-based hand sanitizer. The lack of hand sanitizer is compounded by the fact that most prisoners are not given an adequate supply of soap. Prisoners are similarly being denied adequate cleaning supplies they could use to sanitize their cells and the common areas they must use, such as the showers and phones. The trustees who are responsible for cleaning common areas are not given enough supplies to ensure they are able to disinfect commonly-used surfaces. And regardless of supplies, trustees only clean high-touch surfaces once or twice per day, which is inadequate for areas that are being constantly touched by detainees—like phones and video kiosks. In some units, prisoners are given these same supplies to clean their own cells with the same supplies already used by trustees to wipe down the common areas, with no disinfecting of the supplies in between.

93.     Even after Broward County Jails had multiple confirmed positive COVID-19 cases among detainees and staff, they have still failed to enforce adequate policies for disinfecting surfaces to prevent the spread of the virus.

---

[111] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49.

*Lack of Appropriate Safeguards Employed After Suspected and Known Infected Persons are Identified.*

94.     Defendant Tony and the BSO have failed to isolate suspected positive cases of COVID-19.  BSO has failed to monitor prisoners' symptoms and isolate symptomatic prisoners timely.  This failure exposes other prisoners and staff within close proximately of the symptomatic prisoner to increased risk of contracting COVID-19.

95.     Defendant Tony and the BSO have transported symptomatic suspected cases from facility to facility without proper precautions, disinfection, preparation, or notification to sending facility.

96.     Defendant Tony and the BSO have allowed symptomatic prisoners to continue their trustee roles, traveling between units and exposing increased numbers of prisoners to the risk of contracting COVID-19.

97.     Defendant Tony and the BSO have failed to conduct contact investigations and quarantine persons in close contact with symptomatic and suspected cases.  BSO has failed to keep quarantined persons together in cohorts for 14 days and has instead been moving close contacts from a single potential infection source to different units or facilities without testing, thus exposing others to a risk of transmission.

98.     Defendant Tony and the BSO have failed to timely test those who are symptomatic and likewise failed to timely test those with close contact to suspected/known cases.

99.     Further, BSO does not clean the cells or units of symptomatic prisoners or prisoners who have tested positive for COVID-19 after they were removed from their cell and units.

**D. Because of the Unique and Grave Risks they Face, the Medically Vulnerable Subclasses Cannot Continue to Be Safely Detained.**

100.    Because COVID-19 poses a threat of severe illness, if not death, to the Medically Vulnerable Class, and particular circumstances present at the Broward County Jails that make further spread of the disease highly likely, no set of conditions can adequately protect members of this class.  For this reason, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19.[112]   Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a jail and the broader community.[113]  Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[114]

101.    Across the United States, jail administrators, including in Cuyahoga County, Ohio[115]; San Francisco, California[116]; Jefferson County, Colorado[117]; three Alabama counties[118];

---

[112] *See* Akiyama et al., *supra* note 65 (urging prisons to "decarcerat[e], or releas[e], as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm" in order "to flatten the curve of Covid-19 cases among incarcerated populations" and "limit the impact of transmission both inside correctional facilities and in the community").

[113] *Id.*

[114] *Id.* (explaining that releasing medically vulnerable prisoners will, among other things, "reduce the burden on the correctional system in terms of stabilizing and transferring critically ill patients, as well as the burden on the community health care system to which such patients will be sent.")

[115] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders To Prepare for Coronavirus Pandemic*, NEWS 5 CLEVELAND (Mar. 20 2020), https://cutt.ly/CtRSHkZ.

[116] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26*, S.F. CHRON. (Mar. 20, 2020), https://cutt.ly/0tRSVmG.

[117] Jenna Carroll, *Inmates Being Released Early from JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR COLO. (Mar. 19, 2020), https://cutt.ly/UtRS8LE.

[118] *See Coronavirus:  County Jail Inmates Ordered Released in Autauga, Elmore, Chilton Counties*, MONTGOMERY ADVERTISER (Mar. 18, 2020), https://cutt.ly/QyVANNd.

and the State of New Jersey,[119] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.

102.    As of May 27, 2020, Broward County jails have had 52 confirmed cases of prisoners with COVID-19 across their four facilities.  Yet in the month of May 2020, they released *fewer* prisoners than they released in January 2020—before the pandemic hit.  The jail population was, in fact, *higher* on June 2 than it was in the month of May.

103.    Immediate release of medically vulnerable Plaintiffs remains a necessary public health intervention.  Release is needed not only to prevent irreparable harm to members of the medically-vulnerable Subclasses, but also to reduce the incarcerated population at Broward County Jail sufficiently to ensure proper social distancing to reduce transmission for all class members and the wider public.[120]

104.    Until such time as they are released, medically vulnerable prisoners must be provided with enhanced protections to at least mitigate their risk of contracting COVID-19. The only evidence of a policy to protect this population is a statement BSO has made that, for prisoners 65 and older, temperature and COVID-19 symptoms will be checked on a daily basis, which is plainly inadequate to protect them from infection.  And contrary to BSO's statement, prisoners in Broward County Jails who are 65 or older are *not* having their temperatures taken daily.  Despite clear guidance from public health authorities and the CDC that these prisoners are at a significant

---

[119] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads*, N.J. 101.5 (Mar. 23, 2020), https://cutt.ly/QtRS53w.

[120] Further, in the prison context, the ABA urges that "Governmental authorities in all branches in a jurisdiction should take necessary steps to avoid crowding that . . . adversely affects the . . . protection of prisoners from harm, including the spread of disease." *Standards on Treatment of Prisoners*, 2011 A.B.A. Sec. Crim. Just. 23-3.1(b), available at https://cutt.ly/VyVP7JF.

risk, Defendant Tony and BSO are not taking *any* of a number of possible steps to even attempt to protect this vulnerable population, such as:

- prohibit housing this medically-vulnerable population in open dormitory housing units;

- ensure they are housed in single cells;

- cohort them in long-term housing with persons who have tested negative for COVID-19 and have been cleared from medical isolation to prevent transmission by those with false negative testing results; and

- implement long-term staff assignment by test-confirmed negative staff to prevent staff-prisoner transmission.

105.    The deadly consequences of continuing to house medically vulnerable persons in the jail are evident from the death of Alan Pollock.  Mr. Pollock was 64 years old, wheelchair bound, and had hypertension, schizophrenia, and bipolar disorder. Although in the jail's infirmary before ultimately being taken to the hospital, BSO never tested him for COVID-19. On April 7, 2020,  COVID-19, for which he was not tested, treated or quarantined while in BSO custody, killed him.[121]

### E.  The Jail's Policies, Practices, and Procedures in the Face of COVID-19 Violate the ADA and the Rehabilitation Act.

106.    Defendant Tony's actions and inactions in the face of COVID-19 constitute disability discrimination.  The Disability Subclasses include everyone in the Medically-Vulnerable Subclasses who is vulnerable because of a disability, as defined under federal law, except those vulnerable solely because of age or pregnancy status.  All other conditions that increase risk for

---

[121] Amanda Batchelor & Ian Margol, *supra* note 88.

COVID-19 complications or death—including lung conditions, moderate to severe asthma, heart conditions, diabetes, kidney disease, liver disease, hypertensions and immunosuppressive disorders—are disabilities under federal disability rights laws.  Detainees in the Broward County Jail facilities who have any of these conditions are medically-vulnerable people with disabilities protected by the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"), in addition to being protected by the constitutional provisions that protect all medically-vulnerable Subclass members.  By continuing to detain members of the Disability Subclass without even minimally adequate policies and procedures in place to prevent the spread of COVID-19, Defendants' policies and practices violate the ADA and RA.  Sheriff Tony and BSO are recipients of federal funding and thus subject to the RA.

107.    The ADA requires all covered entities to provide reasonable modifications in their policies, practices, and procedures in order to give people with disabilities an equal opportunity to benefit from the entity's programs, services, and activities.  Broward County Jail is a covered entity under these laws.  Broward County Jail has failed to make modifications to ensure that high-risk people with disabilities can avoid contracting—and possibly dying from—COVID 19.  Exposing disabled prisoners to a virus that can sicken or kill them denies them the ability to benefit from Broward County Jail's programs, services, and activities.  Release of the Disability Subclasses is the most appropriate modification of the jail's program.  Absent that, the jail must implement modifications to protect Disabled Subclass members during incarceration, including implementing meaningful social distancing, ensuring full use of PPE, regular testing, and complete quarantine of people who test positive.  The ADA also prohibits covered entities from using methods of administration that defeat or impair the accomplishment of the objectives of the public entity's program.  For disabled Broward County jail prisoners facing criminal charges or participating in

post-trial proceedings, the jail's main purpose and objectives are to provide required safety and health services while ensuring an individual's appearance at trial or post-trial proceedings. For disabled prisoners serving a criminal sentence, the jail's primary service is to detain them for the duration of their sentence. A person who is sickened, unconscious, or killed by COVID-19 will be unable to make court appearances; those who die of COVID-19 will not complete their sentences. By setting up a system where mass infection and resulting harm and death will disproportionately fall on people with disabilities, the jail has failed to establish methods of administration that do not discriminate against people with disabilities.

108.    As a result of Defendant Tony and the Broward County Jail's failures to make reasonable modifications, including release, and its failure to establish a non-discriminatory method of administering its program, people with disabilities are being denied an equal opportunity to participate in the adjudication of their cases and are denied the reasonable modifications they may need to survive this pandemic.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

110.    Plaintiffs Christopher Brown, Bernard Franklin, Cody Barnett, Robert Morrill, Todd Watson, Jesse Callins, Gregory Dunning, William Bennett, Heather Lewis and Samuel Paulk seek to represent a class of all current and future detainees in pretrial custody at the Broward County Jails who are Florida residents (the "Pre-Adjudication Class"). The Pre-Adjudication Class includes a Subclass of all persons who, by reason of age or medical condition, are particularly vulnerable to serious illness or death if they were to contract COVID-19 and a Subclass of all persons who suffer from a disability that substantially limits one or more of their major life

activities and who are at an increased risk of contracting, being severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability (the "Disability Pre-Adjudication Subclass"). Plaintiffs Christopher Brown, Cody Barnett, Robert Morrill, Gregory Dunning, William Bennett and Heather Lewis are also representatives of the Medically Vulnerable Pre-Adjudication Subclass and the Disability Pre-Adjudication Subclass.

111.   Plaintiffs Ricardo Gonzales Guerra and Darius Walker Greaves seek to represent a class of all current and future detainees in post-conviction custody at the Broward County Jails who are Florida residents (the "Post-Adjudication Class"). The Post-Adjudication Class includes a Subclass of all persons who, by reason of age or medical condition, are particularly vulnerable to serious illness or death if they were to contract COVID-19 ("Medically Vulnerable Post-Adjudication Subclass"), and a Subclass all persons within the Medically Vulnerable Post-Adjudication Subclass with a disability that substantially limits one or more of their major life activities and who are at an increased risk of contracting, being severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability (the "Disability Post-Adjudication Subclass"). Plaintiff Ricardo Gonzales Guerra is also representative of the Medically Vulnerable Post-Adjudication Subclass and the Disability Post-Adjudication Subclass.

112.   The "Medically Vulnerable" Subclasses are defined as all current and future detainees age 50 and above, as well as all current and future persons detainees of any age with impaired immunity, including chronic diseases and health conditions such as (a) lung disease, (b) heart disease, (c) chronic liver or kidney disease (including hepatitis and dialysis patients), (d) diabetes, (e) hypertension, (f) compromised immune systems (such as from cancer, HIV, or

autoimmune disease), (g) blood disorders (including sickle cell disease), (h) developmental disorder (i) severe mental illness, (j) severe obesity, and/or (k) moderate to severe asthma.[122]

113.    The "Disability" Subclasses are defined as all current and future detainees with a disability that substantially limits one or more of their major life activities and who are at an increased risk of contracting, being severely ill from, and/or dying from COVID-19 due to their disability or any medical treatment necessary to treat their disability.

114.    This action has been brought and may properly be maintained as a class action under Federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

115.    Joinder is impracticable because (1) the classes are numerous; (2) the classes include future members, and (3) the class members are incarcerated, rendering their ability to institute individual lawsuits limited.

116.    On information and belief, there are at least 40 people in the proposed Pre-Adjudication Class, at least 40 people in the proposed Post-Adjudication Class, and at least 40 people in each proposed Subclass.

---

[122] *See Coronavirus Disease (COVID-19) Advice for the Public*, *supra* note 49 ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus."); *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, *supra* note 49 (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); *Coronavirus 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, *supra* note 49; Safiya Richardson, et al., *supra* note 49 (examining 5,700 persons hospitalized for COVID-19 and finding the most common comorbidities were hypertension (3,026; 56.6%), obesity (1,737; 41.7%), and diabetes (1,808; 33.8%)); *Coronavirus 2019 (COVID-19): People with Developmental and Behavioral Disorders*, *supra* note 49 ("Some people with developmental or behavioral disorders may have difficulties accessing information, understanding or practicing preventative measures, and communicating symptoms of illness."); CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 49 ("Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.").

117.     Common questions of law and fact exist as to all members of the proposed classes: all are at risk of unreasonable risk of serious harm from contracting COVID-19 due to Defendant's failure to take reasonable measures to ensure their safety from the disease, and all have a right to receive adequate COVID-19 prevention, testing, and treatment. These questions include:

a.   Whether the challenged conditions related to the Broward County Jails' response to COVID-19, including inadequate screening on intake, insufficient testing, a lack of social distancing, a failure to properly quarantine confirmed and suspected cases of COVID-19, and provision of inadequate cleaning suppliers and personal protective equipment, subjects Plaintiffs to an unreasonable risk of serious harm

b.   Whether Defendant knew of and disregarded that risk of serious harm to Plaintiffs

c.   Whether the Medically Vulnerable Subclasses are entitled to release because there is no set of conditions under which they can be adequately protected from the serious risk of COVID-19

d.   Whether the Pre-Adjudication Class are subjected to unlawful punishment and have a right to be free from incarceration unless their detention is found to be necessary to advance the compelling government interest in court appearance or public safety.

e.   Whether Defendant has failed to provide reasonable accommodations to protect members of the Disabled Subclass from COVID-19

f.   Whether Plaintiffs are entitled to a temporary restraining order, preliminary injunction, a permanent injunction, and/or any other equitable relief

118.     Named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  Plaintiffs have no interests adverse to the interests of the proposed class. Plaintiffs retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation. Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

119.     Defendant has acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

120.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the proposed classes.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement
in Violation of the Fourteenth Amendment
42 U.S.C. § 1983
On Behalf of the Pre-Adjudication Class and Disability Rights Florida**

121.     Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

122.     Under the Fourteenth Amendment, persons in pretrial custody have greater due process protections than  those convicted or crimes have under the Eighth Amendment.  As part of these protections, the government must provide persons detained pre-trial with reasonably safe conditions of confinement and address serious medical needs that arise in jail.

123.     Defendant has deprived and continues to be deprive Plaintiffs and the classes they represent of their rights under the Fourteenth Amendment to reasonably safe conditions of confinement.  Under both the objective and subjective tests for deliberate indifference, Defendant Tony is liable.  He has failed to provide Plaintiffs with reasonably safe conditions or address their serious medical needs during the COVID-19 pandemic.   Defendant is aware of the significant risk to health and safety that COVID-19 poses to all individuals and is further aware that the current practices and conditions as well as policies and procedures at the jail exacerbate this risk for the Pre-Adjudication Class. Despite this knowledge of the substantial risk of severe illness and even death created by the conditions of confinement, Defendant has failed to act reasonably to address these dangers.

124.     As a result of Defendant's actions and inactions, class members face irreparable harm, including a substantial risk of contracting COVID-19 and sustaining a serious illness that could lead to death.

125.     Defendant's failure to take appropriate steps to curb the substantial threat posed by COVID-19 to each person in his  custody, including those individuals who have a disabling condition or who are otherwise medically vulnerable, as described more fully above, violates Plaintiffs' rights to be free from unreasonable risk of serious illness, death and bodily harm.

126.     Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

## SECOND CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement**
**in Violation of the Eighth Amendment**
**42 U.S.C. § 1983**
**On Behalf of the Post-Adjudication Class and Disability Rights Florida**

127.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

128.    Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail.

129.    Defendant has deprived and continues to deprive Plaintiffs and the classes they represent of their rights under the Eighth Amendment to reasonably safe conditions of confinement. Defendant is aware of the significant risks to health and safety that COVID-19 poses to all individuals, and is further aware that the current operating policies and procedures at the jail exacerbate this risk for the Post-Adjudication Class. Despite this knowledge of the substantial risk of severe illness and even death created by the conditions of confinement, Defendant has disregarded these risks, and failed to act reasonably to address these dangers.  This inaction reflects Defendant's deliberate indifference to excessive risks to Plaintiffs' health and safety.

130.    As a result of Defendant's actions and inactions, class members face irreparable harm, including a substantial risk of contracting COVID-19 and sustaining a serious illness that could lead to death.

131.    Defendant's failure to take appropriate steps to curb the substantial threat posed by COVID-19 to each person in his custody, including those individuals who have a disabling condition or who are otherwise medically vulnerable, as described more fully above, violates Plaintiffs' rights to be free from unreasonable risk of serious illness, death and bodily harm.

132.    Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

### THIRD CLAIM FOR RELIEF

**Unconstitutional Punishment
in Violation of the Fourteenth Amendment
42 U.S.C. § 1983
On Behalf of the Pre-Adjudication Class and Disability Rights Florida**

133.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

134.    Under the Fourteenth Amendment, persons in pre-trial custody cannot be punished as part of their detention.  Punishment is established if the jailer's conduct  either is not rationally related to a legitimate, nonpunitive, government purpose or is excessive in relation to that scope.

135.    Defendant has subjected Plaintiffs to unlawful punishment through acts and omissions that are not reasonably related to a legitimate non-punitive government purpose or are excessive in relation to that purpose. No legitimate government purpose is served by unnecessarily subjecting pretrial detainees to an excessive risk of exposure to and contracting COVID-19.  Nor is any legitimate government purpose served by failing to address these risks.  Exposing pretrial detainees to an excessive risk of contracting COVID-19, and of serious illness and death for those who are medically vulnerable, is not rationally related to the purpose of pretrial confinement, which is to ensure the presence of a detainee at trial.

136.    Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

## FOURTH CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement
in Violation of the Eighth and Fourteenth Amendments
42 U.S.C. § 1983
On Behalf of the Medically-Vulnerable Subclasses**

137.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

138.    Members of the Medically-Vulnerable Subclasses are particularly susceptible to infection, injury and death from COVID-19.

139.    As a result of their specific characteristics, no conditions of confinement at the Broward County Jail will adequately protect members of the Medically-Vulnerable Subclasses from the risk of infection, serious injury and death.

140.    Because the Broward County Jails are not overcapacity, the injury suffered by the Medically-Vulnerable Subclasses is not the result of overcrowding.

141.    Defendant is therefore holding members of the Medically-Vulnerable Subclasses in custody in violation of the Eighth Amendment's right to be free from cruel and unusual punishment and the Due Process Clause of the Fourteenth Amendment.

142.    Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

## FIFTH CLAIM FOR RELIEF

**Petition for a Writ of Habeas Corpus
for Confinement in Violation of the Eighth and Fourteenth Amendments
28 U.S.C. § 2241
On Behalf of the Medically-Vulnerable Subclasses**

143.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

144.    Members of the Medically-Vulnerable Subclasses are particularly susceptible to infection, injury and death from COVID-19.

145.    As a result of their specific characteristics, there are no conditions of confinement that will adequately protect members of the Medically-Vulnerable Subclasses from the risk of infection, serious injury and death.

146.    Defendant is therefore holding members of the Medically-Vulnerable Subclasses in custody in violation of the Eighth Amendment's right to be free from cruel and unusual punishment and the Due Process Clause of the Fourteenth Amendment due to the fact of their confinement.

147.    Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the classes they represent.

### SIXTH CLAIM FOR RELIEF

**Discrimination on the Basis of Disability
in Violation of Title II of the Americans with Disabilities Act ("ADA")
42 U.S.C. § 12131 *et seq.*
On Behalf of the Disability Subclass and Disability Rights Florida**

148.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

149.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.  Title II of the ADA require that public entities avoid policies, practices, criteria, or methods of administration that have the effect of excluding or discriminating against persons with disabilities in the entity's programs, services, or activities. 28 C.F.R. § 35.130(a), (b)((3), (8). Further, a public entity must "make reasonable modifications in policies, practices, or procedures

when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Failure to make reasonable modifications necessary is a violation of the ADA.

150.    Defendant Tony is sued in his official capacity as the Sherriff and Chief Corrections Officer of Broward County.  Broward County is a municipal corporation organized under the laws of the State of Florida and is a public entity covered by Title II of the ADA.  42 U.S.C. § 12131.

151.    Members of the Disabled Subclasses are individuals with disabilities within the meaning of the ADA.  42 U.S.C. § 12102. They have physical and/or mental impairments that substantially limit one or more major life activities, including but not limited to chronic diseases and health conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, cognitive disabilities, severe mental illness,  severe obesity, and asthma. 42 U.S.C. § 12102(2). Major life activities of class members  include respiratory and other functions of the body, such as the immune system, circulatory system, endocrine (to regulate blood sugar), kidney (the ability to cleanse and eliminate body waste), normal cell growth, digestive, bowel, bladder, neurological, brain, circulatory, as well as limitations in breathing, eating, sleeping, thinking, concentrating, standing, and walking, among others. Members of the Disabled Subclass are "qualified" for the programs, services, and activities being challenged herein. 42 U.S.C. § 12131(2).

152.    Defendant is violating Title II of the ADA by failing to make the reasonable modifications necessary to provide Disabled Subclass members an equal opportunity to benefit

from the Jail's "services, programs, or activities," including medical care, meals, rehabilitative programming. Failure to make these modifications places members of the Disabled Subclass at high risk of severe infection or death from COVID-19, and this risk is excluding them from equal access to life in jail, and from an equal opportunity to adjudicate their cases for those who are pretrial. Defendant is further violating the ADA by employing methods of administration that tend to discriminate against people with disabilities.

153.    The only reasonable modification in the face of the unprecedented risks of COVID-19 is removal from the jail, whether through medical furlough, release and/or transfer to home detention to allow subclass members to quarantine more safely in their homes. In the alternative, reasonable accommodations for people with qualifying disabilities include but are not limited to: separate living spaces rather than high-capacity shared rooms and dorms with people in close proximity; universal testing and screening for COVID-19; free distribution of adequate cleaning supplies, including soap; frequent cleaning of common areas; free distribution of adequate personal protective equipment, including masks and gloves; education on COVID-19 risks and prevention; suspension and waiver of co-payments and charges for medical treatments and visits; staggered access to bathrooms, meals, and other shared resources.

154.    Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the class they represent.

## <u>SEVENTH CLAIM FOR RELIEF</u>

**Discrimination on the Basis of Disability
in Violation of Section 504 of the Rehabilitation Act ("RA")
29 U.S.C. § 794 *et seq.*
On Behalf of the Disability Subclass and Disability Rights Florida**

155.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

156.    The Rehabilitation Act requires entities that receive federal funding, such as the Broward County Jails, not to discriminate against Americans with qualifying disabilities. Defendant Tony receives federal financial assistance for services, programs, or activities.  *See* 29 U.S.C. § 794(a).

157.    Section 504 of the RA, 29 U.S.C. § 794, requires entities such as the Broward County Jails to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.  Section 504 further states that "no otherwise qualified individual with disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices criteria or methods of administration that have the effect of discriminating against persons with disabilities. 28 C.F.R. § 41.51(b)(3)(i).

158.    Plaintiffs, and other members of the Subclasses, are individuals with disabilities under the meaning of the RA.

159.    Access to safe conditions of confinement and adequate preventative and responsive medical treatment are programs or services that Defendant must provide—but is not presently providing—to people in its custody to comply with the RA.

160.    Defendant is violating the RA by failing to make the reasonable modifications necessary to provide Disabled Subclass members an equal opportunity to benefit from the Jail's "services, programs, or activities," including medical care, meals, rehabilitative programming. Failure to make these modifications places members of the Disabled Subclass at high risk of severe

infection or death from COVID-19, and this risk is excluding them from equal access to life in jail, and from an equal opportunity to adjudicate their cases for those who are pretrial. Defendant is further violating the RA by employing methods of administration that tend to discriminate against people with disabilities.

161.     The only reasonable modification in the face of the unprecedented risks of COVID-19 is removal from the jail, whether through medical furlough, release and/or transfer to home detention to allow subclass members to quarantine more safely in their homes. In the alternative, reasonable accommodations for people with qualifying disabilities include but are not limited to: separate living spaces rather than high-capacity shared rooms and dorms with people in close proximity; universal testing and screening for COVID-19; free distribution of adequate cleaning supplies, including soap; frequent cleaning of common areas; free distribution of adequate personal protective equipment, including masks and gloves; education on COVID-19 risks and prevention; suspension and waiver of co-payments and charges for medical treatments and visits; staggered access to bathrooms, meals, and other shared resources.

162.     Plaintiffs seek injunctive and declaratory relief against Defendant to prevent the continued violation of the rights of Plaintiffs and the class they represent.

## REQUEST FOR RELIEF

163.     WHEREFORE, Plaintiffs and proposed Class Members respectfully request that this Court:

A. Certify this case as a class action and certify the proposed Class and Subclasses.

B. Enter an order declaring that Defendant's policies and practices regarding COVID-19 violate the Eighth and Fourteenth Amendments to the United States Constitution.

C.  Enter an order declaring that Defendant has violated the ADA and RA by failing to
reasonably accommodate incarcerated individuals with disabilities.

D.  Enter a temporary restraining order, preliminary injunction, permanent injunction, and/or
grant a writ of habeas corpus requiring Defendant to release all Medically-Vulnerable
Subclass Members in both the Pre-Adjudication and Post-Adjudication Classes, through
an expedited process to be ordered by the Court.

E.  Order (i) an inspection of the Broward County Jail facilities by a medical expert who can
provide a report in advance of a preliminary or permanent injunction hearing, and (ii) any
other pre-hearing discovery that may be appropriate.

F.  Require a plan to be submitted to the Court, overseen by a qualified expert or experts
pursuant to Fed. R. Evid. 706, which outlines:

    i.  Specific mitigation efforts to prevent, to the degree possible, contraction of
COVID-19 by all detainees.

    ii.  A housing and/or public support plan for any Class or Subclass Members due to
be released whose testing confirms have been exposed to or infected with
COVID-19 and who do not readily have a place to self-isolate for the CDC-
recommended period of time (currently 14 days).

    iii.  A COVID-19 housing plan that maximizes the use of all potential space to house
prisoners (including currently unused space or facilities that can be repurposed for
this purpose) to be implemented at Broward County Jails.

G.  Enter a temporary restraining order, preliminary injunction and/or permanent injunction
requiring Defendant to:

i.    Regularly and systematically educate class members, in a manner adequate for class members with low literacy or for whom English is not their primary language, of (i) all symptoms of COVID-19, (ii) techniques for preventing transmission of COVID-19, including social distancing and proper use of masks, cleaning and hygiene supplies, and (iii) jail policies and procedure concerning the prevention COVID-19 transmission.

ii.   Conduct temperature checks, and verbal screening for COVID-19 symptoms or contact with infected individuals, of all individuals booked or transferred into the Broward County Jail upon entry or re-entry.

iii.  Cohort new entrants into the Broward County Jails for a period of 14 days, and perform twice daily symptom screening and temperature checks on these individuals.

iv.   Adopt all reasonable measures to enable social distancing of six feet or more between detainees, including by housing detainees in unused cells, units and facilities to the greatest extent practicable, prioritizing single-person cells for members of the Medically-Vulnerable Subclasses and detainees who display symptoms of COVID-19.

v.    Provide class members with (i) new single-used masks on a daily basis, or (ii) reusable cloth masks and sufficient supplies to allow those cloth masks to be properly sanitized daily.

vi.   Provide ready access to and free of charge cleaning and hygiene supplies (including liquid soap, cleaning supplies, paper supplies, and sanitizer with at least 60 percent alcohol).

vii.    Require all staff working in County jails to wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after making physical contact with any person.

viii.    Conduct universal COVID-19 testing of all class members and jail staff, and immediate testing of any individual displaying COVID-19 symptoms, prioritizing members of the Medically-Vulnerable Subclasses, new entrants into the Broward County Jails, any individual who reports or is otherwise identified to have symptoms of COVID-19, and any class member being released.

ix.    Conduct twice daily symptom screening and temperature checks for all members of the Medically-Vulnerable Subclasses, to the extent any such members are not released, and routinely conduct symptom screening and temperature checks during all healthcare appointments to identify COVID-19 symptoms.

x.    Have trained personnel clean any common areas shared by at least four detainees at least once every hours from 7 a.m. to 10 p.m.

xi.    Suspend and waive all co-pays and charges for medical/sick calls, grievances, or other requests to see a healthcare provider, as well as any medical treatment.

xii.    Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly medically isolated in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video visitation, communications with counsel, and personal property.

xiii.    Provide the Court and Plaintiffs' counsel with twice-weekly statistics on (i) the number of COVID-19 tests that have performed on detainees and jail staff, and (ii) the results of such tests.

H.  Take all further action required—including ordering Defendants to adopt and implement any expert recommendations following an expert inspection of the Broward County Jails—to ensure that all remaining detainees in Broward County Jails are detained under conditions consistent with recognized public health and CDC guidance and to prevent the spread of COVID-19.

I.  Retain jurisdiction over this case until Defendant has fully complied with the orders of this Court, and there is a reasonable assurance that they will continue to comply in the future, absent continuing jurisdiction.

J.  Award Petitioners/Plaintiffs' attorney fees and costs under 42 U.S.C. §§ 1988 and 12205 and any other applicable law.

K.  Grant any further relief this Court deems appropriate.

Dated: June 5, 2020

Respectfully submitted,

**Anjana Samant** (*pro hac vice* pending)
**Steven Watt** (*pro hac vice* pending)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
120 Broad Street, 18th Fl.
New York, NY  10004
Telephone: (212) 549-2500
asamant@aclu.org
swatt@aclu.org

*/s/ Benjamin James Stevenson*
**Benjamin James Stevenson**
Florida Bar. No. 598909
ACLU FOUNDATION OF FLORIDA
3 W. Garden St., Suite 712
Pensacola, FL  32502-5636
Telephone: (786) 363-2738
bstevenson@aclufl.org

**Brian Stull** (*pro hac vice* pending)
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
Telephone: (919) 682-9469
bstull@aclu.org

**Eric Balaban** (*pro hac vice* pending)
AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
915 15th St., N.W.
Washington, D.C. 20005
Telephone: (202) 393-4930
ebalaban@aclu.org

**Suhana S. Han** (*pro hac vice* pending)
**Akash M. Toprani** (*pro hac vice* pending)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone: (212) 558-4000
hans@sullcrom.com
toprania@sullcrom.com

**James H. Congdon** (*pro hac vic pending*)
SULLIVAN & CROMWELL LLP
1700 New York Ave NW
Washington, DC 20006
Telephone: (202) 956-7500
congdonj@sullcrom.com

**Jacqueline Nicole Azis**
Florida Bar No.101057
ACLU FOUNDATION OF FLORIDA
4023 N. Armenia Ave., Suite 450
Tampa, FL 33607
Telephone: (786) 363-2708
jazis@aclufl.org

**Daniel Tilley**
Florida Bar No. 102882
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler St., Suite 400
Miami, FL 33134
Telephone: (786) 363-2714
dtilley@aclufl.org

**Curtis Filaroski**
Florida Bar. No. 111972
**Kathryn Strobach**
Florida Bar No. 670121
DISABILITY RIGHTS FLORIDA, INC.
1000 N. Ashley Drive, Suite 640
Tampa, Florida  32308
Telephone: (850) 488-9071
curtisf@disabilityrightsflorida.org
kathryns@disabilityrightsflorida.org

*Attorneys for Plaintiffs/Petitioners*