UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61113-CIV-DIMITROULEAS/SNOW

CODY BARNETT, WILLIAM BENNET,
CHRISTOPHER BROWN, JESSE
CALLINS, GREGORY DUNNING,
BERNARD FRANKLIN, RICARDO
GONZALES GUERRA, HEATHER LEWIS,
ROBERT MORRILL, SAMUEL PAULK,
HELEN PICIACCHI, DARIUS WALKER
GREAVES and TODD WATSON, *on their
own and on behalf of a class of similarly
situated persons,*

      Plaintiffs,

DISABILITY RIGHTS FLORIDA, INC.,

      Plaintiff,

v.

GREGORY TONY, *in his official capacity as
Sheriff of Broward County,*

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION ON MOTION FOR ENFORCEMENT AND MODIFICATION OF CONSENT DECREE</u>

THIS CAUSE is before the Court on Plaintiffs', Cody Barnett, et al. (the "Plaintiffs"), Motion for Enforcement and Modification of Consent Decree (the "Motion"). (ECF No. 130)  The Honorable William P. Dimitrouleas referred the Motion to United States Magistrate Judge Lurana S. Snow for appropriate disposition or report and recommendation pursuant to 28 U.S.C. § 636. (ECF No. 139)  An evidentiary hearing (the "Hearing") was held before the undersigned via Zoom on October 21, 2021 pursuant to this Court's Order. (ECF No. 149)  This matter is now ripe for review.

# I. <u>BACKGROUND</u>

On June 5, 2020, Plaintiffs, for themselves and proposed class members imprisoned at the Broward County Jail (the "Jail"), filed a complaint and petition for writ of habeas corpus alleging that the conditions of their confinement violated their rights under the Eighth and Fourteenth Amendments, the Americans with Disabilities Act, and the Rehabilitation Act. (ECF No. 142 at 1)  Plaintiffs sued Defendant Gregory Tony, the Sheriff of Broward County, Florida in his official capacity (the "Defendant"), seeking remedies to address alleged substantial risks of their contracting COVID-19, and of suffering serious illness or death should they contract the virus. (ECF No. 142 at 1)

Plaintiffs and Defendant subsequently negotiated a Settlement Agreement (the "Settlement Agreement") that included a certification of a Settlement Class, which was executed on November 30, 2020. (ECF Nos. 130 at 11; 103-1)  The District Court approved the Settlement Agreement on May 13, 2021. (ECF No. 112)  As part of the Settlement Agreement, Defendants committed to undertaking a series of measures to protect class members from COVID-19 infection.  Plaintiffs now move to enforce and modify the Settlement Agreement. (ECF No. 130)

First, Plaintiffs argue that Defendant has failed to carry out several of its obligations as outlined in the Settlement Agreement. (ECF No. 130 at 9)  To establish this, Plaintiffs rely on the testimony of multiple detainees and the testimony and Report of Dr. Homer Venters (ECF No. 131-8), which was completed after a two-day inspection of the Jail. (ECF No. 130 at 9)  On October 21, 2021, the Hearing was held before the undersigned via Zoom.  At the Hearing, Plaintiff

presented five witnesses: Dr. Venters, Damar Pink, Roy Williams Simpson, III, Lemar Thomas, and Quintin Dominique Kersey. (ECF No. 163)

Dr. Venters, an expert in health and epidemiology, testified at the Hearing as to what he witnessed at the Jail during his inspection. Dr. Venters testified that while at the time of his inspection there were procedures in place "to ask people about COVID symptoms and check their temperature on the way in the door," Defendant was not testing newly admitted detainees for COVID-19 at intake. (ECF No. 163 at 22) He continued, "I don't believe that there was a symptoms screen for people going to court or returning from court and I don't believe that there was a test." Id. at 39. Similarly, Dr. Venters testified that he did not believe that individuals were being tested prior to release into the community unless that individual was being released to certain community programs. Id. at 40. Nor did he believe that Defendant was testing detainees prior to inter-facility transfers. Id. at 42. Dr. Venters also testified that to his knowledge, there was no systematic testing of staff for COVID-19. Id. at 30. Dr. Venters found this to be problematic because staff are generally considered to be the "primary vectors" for COVID-19 to infiltrate correctional facilities. Id. at 29-30.

Next, Dr. Venters testified that newly admitted detainees could spend anywhere from one to four days at a transitional area called a "bus stop" prior to any cohorting and that those in need of mental health or medical services were "going straight into these units" and were not subject to a 14-day cohort period prior to going to the infirmary or mental health unit. Id. at 32. Based on conversations with detainees and staff, Dr. Venters determined that "it does not appear that all

high-risk people are identified at intake." Id. at 63.   Additionally, Dr. Venters expressed his understanding that Defendant was not serially re-testing or appropriately monitoring for COVID-19 symptoms for detainees in quarantine units after initial intake. Id. at 34-35.

Finally, Dr. Venters testified about several best-practices that Defendant could implement to lower the risk of a COVID-19 outbreak and opined on the COVID-19 vaccination rate at Defendant's facilities, deeming it lower than comparable correctional facilities with which he has worked. Id. at 46-47.   In response to questions posed by the undersigned to Dr. Venters regarding whether any of those facilities with higher vaccination rates were located in states such as Florida or Texas where vaccine mandates are prohibited, Dr. Venters responded that none of those facilities was located in such a state. Id. at 56-57.   Dr. Venters did not know whether the lower vaccine rate in this case was reflective of the larger community outside of the Jail. Id.

Damar Pink, an inmate at one of Defendant's facilities, testified as to his personal experiences with COVID-19 practices in the Jail.   He stated that at least some detainees are only screened, and not tested, for COVID-19 while displaying certain symptoms such as coughing and sweating. Id. at 95, 106-108.   Mr. Pink further testified that he was not automatically re-tested when his roommate's COVID-19 test came back positive while he was housed in a quarantine unit. Id. at 101-105.   Instead, Mr. Pink had to put in a sick call request in order to get a second test. Id.   Additionally, Mr. Pink testified that he was not screened or tested for COVID-19 prior to being transferred from one unit to another within the same

facility. Id. at 96.   Regarding replacement and availability of masks, Mr. Pink testified that the longest he had gone without mask replacement was about three months. Id. at 111.

Roy Williams Simpson, III, another detainee, testified that he was not tested for COVID-19 or temperature checked before attending court visits. Id. at 176. Similarly, he testified that he was not tested or temperature checked before being transferred to a new unit within the same facility. Id. at 124-125.  Mr. Simpson also stated that he was tested only once while in a quarantine unit. Id. at 127-128.  Mr. Simpson described in detail his medical conditions, including COPD, hypertension, and hepatitis C. Id. at 125.  Mr. Simpson testified that despite these conditions, he was not temperature checked or otherwise monitored for COVID-19 on a regular basis. Id. at 175-176.   Regarding replacement and availability of masks, Mr. Simpson related that he was given two cloth masks approximately three weeks before the Hearing; prior to that time, he only had one cloth mask. Id. at 178-180. Similarly, he testified that the disposable medical mask that he wears has not been replaced since August. Id.

Lemar Thomas, the third detainee to testify, stated that during the intake process he was never tested or screened for symptoms. Id. at 138-139.  Nor was he re-tested in a quarantine unit after another detained person had tested positive for COVID-19. Id. at 153.  Mr. Thomas also testified that he was not tested or screened before any of the five times that he was transferred to different facilities or units. Id. at 164.  Furthermore, Mr. Thomas described his experience sleeping on a plastic

bed called a "boat" prior to his 14-day cohort period, where it was practically impossible to be socially distanced from others. Id. at 139-141.

Quintin Dominique Kersey, a detainee and Plaintiffs' final witness, testified that he was not tested or screened for symptoms during the intake process. Id. at 190-191. Mr. Kersey also stated that he was not tested or screened before or after any of his multiple court appearances. Id. at 196, 198, 200, 201. Likewise, Mr. Kersey testified that he was not tested prior to being transferred to different facilities or units. Id. at 191-195. Mr. Kersey also described his experience of being taken to the infirmary, and then the main jail, before his 14-day cohort. Id. at 191-192.

Plaintiffs rely on the testimony of these witnesses primarily in support of their request for enforcement of the Settlement Agreement. Plaintiffs argue, in addition, that the Settlement Agreement should be modified because it was limited by the knowledge that was available in November of 2020, before the COVID-19 vaccines were available, and prior to the current "Delta" outbreak. (ECF No. 130 at 10) Plaintiffs note that currently, only 28.2% of detainees within the Jail are vaccinated, which is "substantially lower than the average rate both in the Broward community and among correctional facilities nationwide." Id. Accordingly, Plaintiffs believe Defendant should be required to do more to increase the vaccination rates of both prisoners and prison staff.

To illustrate the significance of the Motion, Plaintiffs assert that the result of Defendant's failures combined with changed circumstances have led to a swell in infections from one detected positive COVID-19 case at the Jail on July 18, 2021, to

129 cases by September 20, 2021. (ECF No. 130 at 8-9)  It is important to note, however, that through the entirety of the Delta variant outbreak, no detainee in Defendant's custody has died from COVID-19. (ECF 163 at 59)

## II. <u>DISCUSSION</u>

### A.    Enforcement

Defendant argues that Plaintiffs' motion is procedurally improper because they believe Plaintiffs must first establish by clear and convincing evidence that Defendant has violated a prior Court order, after which a show cause order would be entered by the Court. (ECF No. 142 at 8)  Contrary to Defendant's position, courts recognize a distinction between a motion to "punish violators for contempt" and a motion "to enforce settlement agreements in actions pending before them." <u>S. Beach Suncare, Inc. v. Sea & Ski Corp.</u>, No. 98-1114-CIV, 1999 WL 350458, at *5-6 (S.D. Fla. May 17, 1999).  "Two different standards, therefore, apply." <u>Id.</u> at *5. Defendant is correct that clear and convincing evidence of a violation of a consent decree is required for civil contempt.  However, "[o]nce entered, a consent decree may be enforced" by the court. <u>Frew ex rel. Frew v. Hawkins</u>, 540 U.S. 431, 440 (2004).  This inherent power to enforce a "settlement agreement between the parties inheres in the district court's role as supervisor of the litigation, and the exercise of that power is entrusted to the court's sound discretion." <u>S. Beach Suncare</u>, 1999 WL 350458, at *6.

The Court's enforcement power is governed by state contract law since a settlement agreement "is merely a contract between parties to litigation." <u>Id.</u>; <u>See also</u> <u>Frulla v. CRA Holdings, Inc.</u>, 543 F.3d 1247, 1252 (11th Cir. 2008).  Unlike

contempt proceedings, courts "may enforce a settlement agreement on proof of breach by a preponderance of the evidence." S. Beach Suncare, 1999 WL 350458, at *11. Moreover, none of the cases cited by Defendant suggest that a party seeking to enforce a settlement agreement must do so through a contempt proceeding. See, e.g., Peery v. City of Miami, 977 F.3d 1061 (11th Cir. 2020); Reynolds v. Roberts, 207 F.3d 1288 (11th Cir. 2020).

Although Plaintiffs cite in their Motion cases relating to civil contempt, they make clear that they are not requesting the Court to hold Defendant in contempt at this time. (ECF No. 130 at 35) Plaintiffs seek only enforcement and modification of the Settlement Agreement. Additionally, the Settlement Agreement specifically contemplates such a motion for enforcement and distinguishes it from a motion for contempt. (ECF No. 142-1 at ¶ 24) Accordingly, the undersigned made the following ruling at the outset of the Hearing:

> And I will say, before we get started, the Plaintiffs have stated unequivocally that they are not seeking an order of contempt of court. Therefore, the standards for contempt are not applicable here. We're not going to consider holding the Defendants in contempt. Therefore, the standard for proof of any violation of agreement is by a preponderance of the evidence.

(ECF No. 163 at 5-6)

Defendant acknowledged the Court's ruling on the standard of proof but did not waive its procedural objection and declined to present any evidence at the Hearing. Id. at 10. The undersigned now reaffirms the Hearing ruling that Plaintiffs must prove a violation of the Settlement Agreement by a preponderance

of the evidence. See S. Beach Suncare, 1999 WL 350458, at *11.[1]  Also, while much of the testimony of Dr. Venters focused on best practices to stop the spread of COVID-19, the Court must address only the measures to which the parties agreed.

With the Settlement Agreement as the principal binding document, Defendant argues that CDC Guidance sets forth guiding principles, not "contractual mandates" as presented by Plaintiffs. (ECF No. 165 at 6-7)  The undersigned is not persuaded by this argument because the Settlement Agreement expressly incorporates, and mandates compliance with CDC Guidance for certain categories of actions.  In each area where the Settlement Agreement incorporates CDC Guidance, such guidance on that topic becomes binding on the parties.

Plaintiffs' enforcement requests can be divided into eighteen categories: testing and screening at admission, testing before release, symptom screening detained persons re-entering jail, re-testing quarantine units, testing and screening detainees prior to transfers, testing symptomatic and exposed detainees, screening staff, separating quarantine and cohort units, contact tracing, cohorting upon admission, re-testing and monitoring during cohorting, identifying medically vulnerable detainees, social distancing of medically vulnerable detainees, medical

---

1. The undersigned similarly finds meritless Defendant's argument that Plaintiffs did not act in good faith in filing the instant Motion on an expedited basis.  Plaintiffs' request for expedited briefing was not "buried" in the Motion, as Defendant contends, but is set forth on the very first page.  And the fact that the Motion came within one day of the parties' "impasse" date does not demonstrate a lack of good faith.  Plaintiffs knew ten days before that date that Defendant was unwilling to act on at least one of the two primary issues raised in the Motion, and Plaintiffs were entitled to begin drafting the Motion before impasse was reached on both issues. (ECF 141 at 1)

isolation of symptomatic detainees, social distancing, personal protective equipment, availability and replacement of masks, and educational information.

Testing and screening at admission

Paragraph 44 of the Settlement Agreement states that Defendant "shall comply with CDC Guidance for correctional and detention facilities that expand testing beyond that provided in this Agreement." (ECF No. 154-9 at 13)   Since February of 2021, CDC Guidance has stated that detention facilities should "[t]est incoming incarcerated/detained persons, including those returning after more than 24 hours away from the facility." (ECF No. 154-2 at 7)   Despite this requirement, for the week ending August 25, 2021, Defendant reported that it had admitted 499 new people to the Jail, but tested only 173. (ECF No. 131-15)   This discrepancy alone appears to establish noncompliance with CDC Guidance as to testing, and therefore, with Paragraph 44 of the Settlement Agreement.   Plaintiffs also presented the testimony of Dr. Venters who testified that Defendant was not testing newly admitted detainees for COVID-19 at intake at the time of his inspection. (ECF No. 163 at 22)   Similarly, both Mr. Thomas and Mr. Kersey corroborated this finding with their own personal experiences at intake.

Defendant claims that it did not begin testing all incoming individuals until August 9, 2021, which means that Defendant, by his own admission was noncompliant with the Settlement Agreement for at least six months.   Although Eleventh Circuit caselaw has not directly addressed this issue, the Seventh Circuit has held that district courts can find a party in contempt because of past violations of a settlement agreement, noting that "it makes sense for the court to be able to

enter orders that help ensure both that past violations don't repeat and that ongoing violations cease." Holmes v. Godinez, 991 F.3d 775 (7th Cir. 2021). Similarly, at least one district court has found that "coming close to compliance at least some of the time" is not tantamount to compliance with a settlement agreement. R.J. v. Mueller, 2020 WL 4934989, at *5 (N.D. Ill. Aug. 24, 2020). These cases are instructive even though Plaintiffs are seeking enforcement rather than a finding of contempt. Accordingly, the undersigned finds that Plaintiffs have shown by a preponderance of the evidence that the Defendant has not complied with CDC Guidance with regard to testing of inmates upon admission, and Defendant shall conduct COVID-19 tests on all individuals at intake.

Testing before release

CDC Guidance also states that the facility should "[t]est incarcerated/detained persons leaving the facility as close to the day of the visit (e.g., medical trips, court appearances, community programs) or release (whether into the community or to a halfway house or other transitional location)." (ECF No. 154-2 at 7) (emphasis added) Defendant concedes that he does not test individuals being released into the community but contends that this is acceptable because the Settlement Agreement "neither addresses nor requires" such testing. (ECF No. 142 at 12) However, because the Settlement Agreement, at Paragraph 44, expressly requires that Defendant comply with CDC Guidance with regard to testing, the requirement of testing individuals before release into the community is incorporated into the Agreement.

Additionally, Dr. Venters testified that he did not believe that detainees leaving the facilities for court visits were being screened or tested before these visits. (ECF No. 163 at 39-40)  The experiences of Mr. Kersey and Mr. Simpson further support that no such testing has been taking place.  This failure to test before release into the community and before court visits also is in direct conflict with the CDC Guidance as incorporated by Paragraph 44 of the Settlement Agreement.  The undersigned therefore finds that Defendant has not complied with the Settlement Agreement in regard to testing at the time of release.  Defendant shall test for COVID-19 all detainees being released or otherwise leaving the Jail, such as to attend court appearances.  Defendant shall utilize rapid tests to ensure that exits from the Jail will not be delayed.

<u>Symptom screening detained persons re-entering jail</u>

Paragraph 41 of the Settlement Agreement requires Defendant to "perform symptom screening and temperature check[s] consistent with CDC recommendations prior to person's transfer." (ECF 154-9 at 12)  While the testimony of Dr. Venters, Mr. Kersey, and Mr. Simpson also tended to show that detainees were not symptom screened for COVID-19 before returning to the Jail from a court visit, such screening is not required by the Settlement Agreement. Paragraph 41 only addresses transfers and requires testing <u>prior</u> to any such transfer.  Even if a court visit could be construed as a transfer under this provision, screening for individuals returning from such visits is not required.  The undersigned finds that Defendant is in compliance with the Settlement Agreement

in regard to symptom screening detained persons re-entering the Jail, and no additional action by Defendant is necessary.

Re-testing quarantine units

Paragraph 48 of the Settlement Agreement requires Defendant to "[i]mplement CDC-compliant cohorting, quarantining, and medical isolation procedures for those who test positive, are symptomatic, or those who have come into close contact with such persons." (ECF No. 154-9 at 14)  As previously noted, Paragraph 44 also requires that Defendant implement COVID-19 testing that is CDC-compliant.  The CDC Guidance states "[i]f quarantine cohorts are used (i.e., if people who are exposed are quarantined together rather than individually due to space constraints), facilities should conduct serial re-testing of the quarantined cohort." (ECF No. 154-2 at 6)  This cohort testing is to be conducted "every 3-7 days regardless of their COVID-19 vaccination status until testing identifies no new cases in the cohort for 14 days since the most recent positive result." Id.

Dr. Venters testified that it was his understanding that Defendant was not serially re-testing individuals in quarantine units in compliance with the CDC Guidance. (ECF No. 163 at 87)  The testimony of Mr. Pink, Mr. Simpson, and Mr. Thomas confirms that Defendant has failed to test detainees in quarantine units every 3-7 days until there are no new cases of COVID-19 in the cohort for 14 days. The undersigned finds that Defendant failed to comply with the Settlement Agreement in regard to re-testing quarantine units.  Accordingly, Defendant shall, in accordance with CDC Guidance, ensure that individuals in quarantine units are

tested for COVID-19 every 3-7 days until testing identifies no new cases in the quarantine unit for 14 days from the most recent positive result.

Testing and screening detainees prior to transfers

As noted, Paragraph 44 of the Settlement Agreement requires that Defendant implement COVID-19 testing that is CDC-compliant and Paragraph 41 requires symptom screening and temperature checks that are CDC-compliant prior to a person's transfer. The CDC Guidance advises that facilities should "implement movement-based screening testing to prevent the introduction of the virus into the facility and to prevent transmission to another facility or into the community." (ECF No. 154-2 at 7)  Specifically, the Guidance recommends that facilities "[t]est incarcerated/detained persons before transfer to another correctional/detention facility. Wait for a negative test result before the transfer." Id.  Moreover, the CDC Guidance also recommends "verbal screening and temperature checks for incarcerated/detained persons . . . who are transferred to another facility or released from custody." (ECF No. 154-3 at 25)

Notably, the CDC does not address intra-facility transfers.  Therefore, witness testimony regarding the lack of tests and screening prior to transfers to different units within the same facility does not establish a breach of the Settlement Agreement.  However, the testimony of Mr. Thomas and Mr. Kersey demonstrates that not all detainees have been tested and screened for COVID-19 prior to being transferred to separate facilities.  In fact, Mr. Thomas testified that he had been transferred to four different facilities and had only been screened or tested prior to one of those transfers. (ECF No. 163 at 163-164)  The undersigned finds that

Defendant has not complied with the Settlement Agreement in regard to testing and screening prior to transfers to different facilities, and such testing prior to such transfers shall henceforth take place.

Testing symptomatic and exposed detainees

Paragraph 43 of the Settlement Agreement requires Defendant to "[t]est all of the following for COVID-19 infection: (1) prisoners and staff who display symptoms; [and] (2) prisoners who are exposed to a person who has tested positive for COVID-19." (ECF No. 154-9 at 13)   Again, all testing must also comply with CDC Guidance pursuant to Paragraph 44.   CDC Guidance states that "close contacts (people who have been within 6 feet of persons with COVID-19 for a combined total of 15 minutes or more during a 24-hour period) should be tested regardless of their COVID-19 vaccination status." (ECF No. 154-2 at 5)   The CDC further recognizes that in correctional facilities, close contacts may be entire units. Id.

All of the evidence put forth by Plaintiffs serves to establish only delayed testing and disputes over whether a detainee has shown sufficient COVID-19 "symptoms" to warrant a test.   The undersigned recognizes that there may be a practical disparity between a medically defined symptomatic person and a detainee's nonmedical understanding of what constitutes a symptomatic person. Without a clear definition in the Settlement Agreement of what it means to "display symptoms" for the purpose of warranting a test, the undersigned finds that Plaintiffs have not shown by a preponderance of the evidence that Defendant failed to comply with testing symptomatic and exposed detainees.   Therefore, Plaintiffs'

request for enforcement of testing symptomatic and exposed detainees should be denied.

<u>Screening staff</u>

CDC Guidance alerts facility administrators that they "should consider including staff in broad-based testing efforts." (ECF No. 154-2 at 8)   Unlike the provisions discussed above, the CDC here only suggests that testing staff be <u>considered</u>.   Plaintiffs have presented no evidence to establish that Defendant did not consider its decision when determining whether and how often to test and screen staff.   Therefore, the undersigned finds that any failure by Defendant to test and screen staff complies with the Settlement Agreement and Plaintiffs' request for enforcement of screening staff should be denied.

<u>Separating quarantine and cohort units</u>

Plaintiffs also take issue with the fact that there is no solid wall separating the cohort and quarantine units at Defendant's Conte Facility.   Instead, owing to the facility's layout, these two units are situated 20-25 feet apart and separated by a "stack of chairs and tables." (ECF No. 130 at 30)   Paragraph 48 of the Settlement Agreement requires Defendant to "[i]mplement CDC-compliant cohorting, quarantining, and medical isolation procedures for those who test positive, who are symptomatic, or those who have come into close contact with such persons." (ECF No. 154-9 at 14)   CDC Guidance calls for facilities to identify "separate physical locations (dedicated housing areas and bathrooms)" to isolate detainees with COVID-19, suspected of COVID-19, and close contacts of those with COVID-19. (ECF No. 154-3 at 3)

However, the CDC further notes that facilities "without sufficient space to implement effective medical isolation, should coordinate with local public health officials" to ensure a safe environment. (ECF No. 154-3 at 14)  The CDC Guidance also recognizes that housing individuals "[s]eperately, in single cells with solid walls" is not always practicable in a jail setting and the Guidance allows facilities without sufficient space to house such individuals as a cohort, in cells "without solid walls or solid doors." (ECF No. 154-3 at 19-20)  Plaintiffs have put forth no evidence suggesting that Defendant has sufficient space to isolate detainees in cells with solid walls.  In fact, the evidence shows that the Conte Facility's layout precludes such separation. (ECF No. 143-1 at 5-6)  The Court finds that Plaintiffs have not established by a preponderance of the evidence that Defendant failed to comply with the Settlement Agreement requirement to seperate quarantine and cohort units.  Accordingly, Plaintiffs' request for enforcement of separating quarantine and cohort units should be denied.

Contact tracing

Despite Plaintiffs' proffered evidence tending to show that Defendant periodically puts entire units in quarantine following a positive COVID-19 test in that unit, neither the Settlement Agreement nor CDC Guidance prohibits such action.  CDC Guidance makes clear that any medical isolation should be non-punitive. (ECF No. 154-3 at 29)  Simultaneously, the CDC recognizes that entire-unit lockdowns are often inevitable in correction facilities owing to the inherent close contact among detainees within a particular unit and permits such entire-unit lockdowns. (ECF No. 154-3 at 20)  Plaintiffs' evidence falls short of establishing that

Defendant's use of entire-unit quarantines instead of some other form of contact tracing violates the Settlement Agreement.  Plaintiffs' request for enforcement of contact tracing in a form other than whole unit lockdowns should therefore be denied.

Cohorting upon admission

Paragraph 49 of the Settlement Agreement requires Defendant to cohort all newly-admitted persons in separate housing units for 14 days, "except for prisoners who require mental health or medical services necessitating their being moved to the infirmary, where they will thereafter be cohorted for 14 days." (ECF No. 154-9 at 15)  Plaintiffs point to the fact that Jail staff reported to Dr. Venters that a newly-admitted person going to the infirmary would not go through the normal cohorting process. (ECF No. 130 at 28)  Additionally, the testimony of Mr. Thomas and Mr. Kersey establishes that the 14-day cohort period may be delayed for people who require mental health or medical services.  Importantly, both Mr. Thomas and Mr. Kersey testified that they eventually had a 14-day cohort period.  The undersigned finds that delaying the 14-day cohort period for detainees requiring specific services is consistent with the Settlement Agreement.  The undersigned accordingly finds that Plaintiffs have failed to carry their burden of demonstrating that Defendant has not complied with the Settlement Agreement in regard to cohorting upon admission and no enforcement action is required.

Re-testing and monitoring during cohorting

Paragraph 49 of the Settlement Agreement also requires Defendant to "monitor [newly-admitted detainees] on a daily basis for COVID-19 infection before

they are transferred to units in other Jail facilities." (ECF No. 154-9 at 15) Additionally, CDC Guidance states that if incoming detainees undergo intake quarantine, facilities should "consider re-testing every 3-7 days." (ECF No. 154-2 at 7)  Here, the CDC only recommends <u>considering</u> such re-testing.  Plaintiffs have put forth no evidence suggesting that Defendant did not consider re-testing such individuals during cohorting.  The testimony regarding Defendant's final decision not to serially re-test does not support a conclusion that re-testing was not considered.  Accordingly, the undersigned finds that Plaintiffs failed to establish non-compliance with the Settlement Agreement in regard to re-testing and monitoring during cohorting and Plaintiffs' request for enforcement of this procedure must be denied.

<u>Identifying medically vulnerable detainees</u>

Paragraph 34 of the Settlement Agreement requires Defendant to "[i]dentify all persons who are vulnerable to serious illness or death because of COVID-19 infection, including all medically vulnerable persons." (ECF No. 154-9 at 10) Paragraph 43 further requires that detainees so identified be tested within 72 hours of being detained (ECF No. 154-9 at 13) and Paragraph 64 requires that these individuals be monitored on a daily basis, including twice-daily temperature checks (ECF No. 154-9 at 20).

Despite these requirements, Jail staff admitted to Dr. Venters at the time of his inspection that Defendant had not even attempted to identify "medically vulnerable" detainees. (ECF No. 130 at 31)  While the undersigned is wary of entering the realm of medical determinations, Mr. Simpson's testimony regarding

his age and several medical conditions including COPD, hypertension, and hepatitis C strongly suggests that Mr. Simpson should have been identified by Defendant as medically vulnerable and appropriately monitored.   Mr. Simpson's testimony establishes that he was not monitored on a daily basis pursuant to Paragraph 64. (ECF No. 163 at 176)   Accordingly, the undersigned finds that Plaintiffs have established by a preponderance of the evidence that Defendant has not identified medically vulnerable detainees in violation of Paragraph 34, 43, and 64 of the Settlement Agreement.   Defendant shall maintain a list of Medically Vulnerable detainees and conduct COVID-19 symptoms screening and temperature checks of such detainees.

Social distancing of medically vulnerable detainees

Paragraph 35 of the Settlement Agreement then requires Defendant to "[h]ouse medically vulnerable persons so they can maintain social distancing of at least six feet from others when possible . . . or, at a minimum, not in cells with other prisoners whose COVID-19 status is unknown or with those who have pending tests or are symptomatic." (ECF No. 154-9 at 10)   However, Paragraph 35 also recognizes that six-foot distancing is not always practicable in a correctional setting, and contains an exception to the social distancing requirement which permits Defendant to document the instances where such distancing cannot be accomplished. Id.   Since the undersigned has found that Defendant has failed to identify medically vulnerable individuals, it follows that Defendant also has failed to comply with the social distancing requirement of Paragraph 35 of the Settlement Agreement.   Where medically vulnerable detainees have not even been identified, the exception which

permits documentation of specific instances where compliance is impossible cannot be applied. To remedy Defendant's failure to comply with Paragraph 35, Defendant shall maintain a list of Medically Vulnerable detainees and track the housing location of such detainees.

Medical isolation of symptomatic detainees

Paragraph 39 of the Settlement Agreement requires Defendant "[h]ouse symptomatic persons in medical isolation in individual cells in separate housing units, not in cells or on tiers with positive or other symptomatic persons." (ECF No. 154-9 at 12)  The undersigned hesitates to rely on the detainee witnesses' nonmedical identifications of symptomatic persons. Without a clear definition of what it means to be a "symptomatic person" sufficient to warrant medical isolation under the terms of the Settlement Agreement, the undersigned finds that Plaintiffs have not established by a preponderance of the evidence that Defendant failed to comply with the Agreement with regard to medical isolation of symptomatic detainees. Plaintiffs' request for enforcement in this area should be denied.

Social distancing of detainees who are not medically vulnerable

Paragraph 36 requires Defendant to "[i]mplement a housing plan that would allow, where possible, prisoners to maintain six-feet of social distancing from others while in their cells." (ECF No. 154-9 at 11)  The language "where possible" makes clear that six-foot distancing in not a mandate, but rather is a flexible guideline which takes into account the circumstances within the facility at a given time. Plaintiffs produced no evidence to establish that social distancing is currently possible in Defendant's facilities. Importantly, Paragraph 36 goes on to carve out

specific exceptions for this general rule stating, "Defendant shall document all instances where prisoners could not maintain a distance of six feet due to a lack of available bed space." Id.  Defendant asserts that the use of "boats" are a temporary measure due to the lack of available space.  Plaintiffs have offered no evidence that contradicts this assertion, and instead rely solely on the fact that "boats" are being used.  As Paragraph 36 expressly takes into account available bed space, the use of "boats," standing alone, is insufficient to show that Defendant violated the Settlement Agreement.

Similarly, Paragraph 37 of the Settlement Agreement requires Defendant to "[l]ay out tape markers at six-foot increments in areas where persons are required to line up or congregate for medications, security searches of cells and housing units, recreation, and food service."  (ECF No. 154-9 at 11)  Plaintiffs produced evidence tending to show that 6-foot markers are absent in some areas of Defendant's facilities, but this evidence did not show that these areas are locations where markers are required.  The undersigned finds that Plaintiffs have not established by a preponderance of the evidence that Defendant failed to comply with the social distancing requirement of the Settlement Agreement, and no additional action by the Defendant is required.

Personal protective equipment ("PPE")

Plaintiffs allege that Defendant did not provide or require adequate PPE for staff.  Specifically, Plaintiffs first take issue with some staff members wearing neck gaiters as face coverings.  Paragraph 54 of the Settlement Agreement requires Defendant to "[p]rovide Jail staff with face coverings and other PPE and supplies

appropriate to their duties in the Jail as recommended by CDC Guidance, including N95 respirators, surgical masks, protective eye-wear, gloves, and/or gowns/coveralls for those working in units with prisoners who have tested positive or are symptomatic." (ECF No. 154-9 at 16)  CDC Guidance for correctional facilities does not explicitly address the use of neck gaiters, but does identify certain face coverings that are not recommended, such as those containing valves. (ECF No. 154-3 at 29)  Instead, the CDC Guidance states that masks "cover the nose and mouth" (ECF No. 154-3 at 29), which includes gaiters.  Beyond this, the CDC Guidance on "Your Guide to Masks" linked in the Guidance for correctional facilities affirmatively contemplates and permits the use of neck gaiters.[2] Accordingly, the undersigned finds that the use of gaiters complies with the Settlement Agreement.

Plaintiffs also take issue with the apparent failure of some staff members working in quarantine units to use PPE gowns.  The undersigned notes that the Settlement Agreement merely requires Defendant to provide staff with proper PPE.  While Plaintiffs' evidence tends to show that staff often did not wear PPE gowns, there is no evidence to suggest that Defendant failed to provide staff with the proper PPE.  Nothing in the Settlement Agreement can be read to require staff to wear PPE gowns in quarantine units at all times.  The undersigned finds that

---

2. CDC Guidance on masks can be found at *Your Guide to Masks*, CDC https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last updated October 25, 2021), and is incorporated in the CDC Guidance for correctional facilities. (See ECF No. 154-2)

Plaintiffs have failed to establish that Defendant has not complied with the PPE requirements in the Settlement Agreement and no further action should be ordered.

Availability and replacement of masks

Paragraph 52 of the Settlement Agreement requires Defendant to provide detained persons "with two face coverings that can be used as well as sanitized or replaced per manufacturers' instructions." (ECF No. 154-9 at 15)  Some detainees testified that they were only provided with one mask at certain times during the pandemic and that soiled masks were not promptly replaced by Defendant.  For example, Mr. Simpson testified that he received two cloth masks three weeks before the Hearing, but prior to that point he was only provided with one cloth mask. (ECF No. 163 at 178-180)  Mr. Pink further testified that he had gone about three months without having his set of masks replaced. (ECF No. 163 at 111)  Most concerning, however, is the sworn declaration of detainee John Vickers stating, "[i]f a disposable mask gets soiled or broken between [the predetermined time of replacement], the Jail often tells inmates that they do not have enough supply to replace the mask." (ECF No. 131-9 at 3)  The undersigned finds that consistent with the Settlement Agreement, Defendant should ensure that detainees are in possession of two face coverings in usable condition at all times.

Educational information

Finally, Paragraph 61 of the Settlement Agreement requires Defendant to educate prisoners on the latest CDC and other public health guidance regarding COVID-19. (ECF No. 154-9 at 18)  Currently, CDC Guidance unambiguously instructs that the best practice to prevent COVID-19 infection and transmission is

to receive one of the three FDA-authorized COIVD-19 vaccines. (See, e.g., ECF No. 154-2 at 2)  Plaintiffs point to the low vaccination rate at Defendant's facilities and anecdotal experiences of several detainees, who claim not to have received adequate information on the vaccines, in order to establish that Defendant is not in compliance with Paragraph 61 of the Settlement Agreement.

Contrary to Plaintiffs' position, from the time the CDC began encouraging vaccination, Defendant has posted educational materials on COVID-19 prevention and vaccination throughout the Jail, and included in those materials documents which Plaintiffs requested be made available to detainees.  Defendant also made at least three loudspeaker announcements per day regarding the availability of vaccinations, and provided in-person education on vaccination through its nurses and healthcare professionals during chronic care visits and routine contact. (ECF No. 142 at 15-16)  Moreover, Plaintiffs concede that Defendant has taken steps to encourage vaccination. (ECF No. 130 at 40)  The undersigned finds that Defendant adequately informed detainees of the available COVID-19 vaccines and is in compliance with Paragraph 61 of the Settlement Agreement.  Therefore, Plaintiffs' request for enforcement in regard to providing detainees with additional educational information regarding the available COVID-19 vaccines should be denied.

## B.    Reporting requirements and independent monitor

Plaintiffs further argue that Defendant's alleged noncompliance warrants "imposing regular and frequent reporting requirements and the appointment of an independent monitor to oversee compliance." (ECF No. 130 at 36)  As previously

noted, Plaintiffs concede that they "ask only for a detailed enforcement order" at this time, and not an order holding Defendant in civil contempt. (ECF No. 130 at 35)  However, Plaintiffs analogize to contempt cases to substantiate their argument that sanctions such as appointing a monitor and requiring more stringent reporting is appropriate in the instant case.

Pursuant to Paragraph 19 of the Settlement Agreement, Plaintiffs and their retained experts are already entitled to conduct reasonable monitoring of the Jail's compliance with the Settlement Agreement.  Plaintiffs contend that this is insufficient to ensure compliance because Plaintiffs' counsel are limited in its ability to monitor due to "the correctional and pandemic context." (ECF No. 130 at 36)  The record in this case undercuts Plaintiffs' argument.  Plaintiffs in fact were able to monitor Defendant's compliance through the inspection conducted by their expert, Dr. Venters, enabling Plaintiffs to file the instant Motion.  Notably, Dr. Venters also notes in his report that Defendant's "leadership was very forthcoming during inspection and appeared eager to provide information as we discussed COVID-19 issues." (ECF No. 131-8 at 31)  The undersigned finds no reason to either impose heightened reporting requirements or appoint a monitor at this time.

## C.   Modification

The Eleventh Circuit has cautioned that "[a] party seeking to modify a consent decree has a high hurdle to clear and the wind in its face." Sierra Club v. Meiburg, 296 F.3d 1021, 1034 (11th Cir. 2002).  Fed. R. Civ. P. 60(b)(5) permits courts to relieve a party from a prior order when "applying it prospectively is no longer equitable."  "Rule 60(b)(5) 'encompasses the traditional power of a court of

equity to modify its [consent] decree in light of changed circumstances.'" <u>Griffin v. Sec'y, Fla. Dep't of Corr.</u>, 787 F.3d 1086, 1090 (11th Cir. 2015) (quoting <u>Frew ex rel. Frew v. Hawkins</u>, 540 U.S. 431).  Courts should apply a "flexible standard" when applying Rule 60(b)(5) to modify consent decrees involving institutional reform. <u>Rufo v. Inmates of Suffolk Cty. Jail</u>, 502 U.S. 367, 368 (1992).

Applying this standard, modification is appropriate where the party seeking modification carries "the burden of establishing that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." <u>Rufo</u>, 502 U.S. at 383.  One way that the moving party <u>may</u> be able to establish a significant change in circumstances warranting modification is by showing that the "consent decree has failed to achieve its purpose." <u>F.T.C. v. Garden of Life, Inc.</u>, No. 06-80226-CIV, 2012 WL 1898607, at *3 (S.D. Fla. May 25, 2012).  However, "consent decrees generally do not have overarching purposes." <u>Sierra Club</u>, 296 F.3d at 1031.  Moreover, "[m]odifications to consent decrees are rarely granted 'because consent decrees are normally compromises between parties with opposing positions in which each party gives up their rights to litigation and to prove their position.'" <u>F.T.C.</u>, 2012 WL 1898607, at *2 (citing <u>Sierra Club</u>, 296 F.3d at 1032).  Therefore, "consent decrees should be interpreted as written." <u>Id.</u>

Unmistakably, a party seeking modification of a consent decree has a high burden to meet. <u>Sierra Club</u>, 296 F.3d at 1034.  Plaintiffs' request for modification is based on the contention that circumstances have changed since the Settlement Agreement was entered.  Specifically, the circumstances that Plaintiffs allege have

changed are that three FDA-approved COVID-19 vaccines are now available and a new, more contagious variant of COVID-19 has developed since November of 2020 when the Settlement Agreement was executed by the parties. (ECF No. 130 at 10) Although the Settlement Agreement was executed in November of 2020, the Settlement Agreement was not approved by the Court until May 13, 2021, at which point all three COVID-19 vaccines were widely available.  Had Plaintiffs been concerned about vaccinations, they certainly could have bargained for the inclusion of such a provision in the Settlement Agreement prior to its approval.  The undersigned will not rewrite the Settlement Agreement based on information that the Plaintiffs possessed prior to May 2021.

Moreover, Defendant has voluntarily taken steps to address the circumstances which have changed since the Settlement Agreement was entered. These voluntary actions include: providing free vaccines to all detainees on a daily basis, incentivizing vaccination by offering those who receive the vaccine a $25-value commissary bag, posting educational materials on COVID-19 prevention and vaccination throughout the Jail, including in the educational materials documents that Plaintiffs requested be made available to detainees, making a minimum of three loudspeaker announcements per day regarding the availability of vaccinations, and providing in-person education on vaccination through its nurses and healthcare professionals during chronic care visits and routine contact. (ECF No. 142 at 15-16)

Plaintiffs modification argument rests on the assumption that the Settlement Agreement has a "purpose" of "protect[ing] incarcerated persons." (ECF No. 130 at

37)  However, consent decrees generally do not have overarching purposes. <u>Sierra Club</u>, 296 F.3d at 1031.  Considering the high burden of proof required to support modification, the availability of vaccines prior to approval of the Agreement, Defendant's voluntary steps to address changed circumstances, and the Eleventh Circuit's disfavor for overarching contractual "purposes," the undersigned concludes that Plaintiffs' request for modification should be denied.

The undersigned does note however, that the CDC Guidance provides that correctional facilities can relax many COVID-19 practices for fully-vaccinated individuals.  Therefore, it is in the parties' interests to increase the vaccination rate at Defendant's facilities, both to ensure the safety of detainees and staff, and to lower the burden on Defendant.

## III. <u>CONCLUSION</u>

After careful review of the Motion, the entire case file, argument of counsel, testimony of the witnesses, the evidence presented, and the applicable law, it is hereby

RECOMMENDED that Plaintiffs' Motion for Enforcement and Modification of Consent Decree (ECF No. 130) be GRANTED IN PART, as follows:

1. Defendant shall, in accordance with CDC Guidance, conduct a COVID-19 test on all individuals at intake;

2. Defendant shall test for COVID-19 all detainees being released or otherwise leaving the Jail, such as to attend court appearances.  Defendant shall utilize rapid tests to ensure that the time for receiving results will not delay the detainee's exit from the Jail;

3. Defendant shall, in accordance with CDC Guidance, ensure that individuals in quarantine units are tested for COVID-19 every 3-7 days until testing identifies no new cases in the quarantine unit for fourteen (14) days after the most recent positive result;

4. Defendant shall conduct temperature and COVID-19 symptom checks prior to all transfers of detainees to different facilities;

5. Defendant shall maintain a list of medically vulnerable detainees and conduct COVID-19 symptoms screening and temperature checks of such detainees;

6. Defendant shall track the housing location of medically vulnerable detainees, and

7. Defendant shall ensure that detainees possess two face coverings in usable condition at all times.

It is further RECOMMENDED that the Motion be DENIED, as follows:

1. No action by the Defendant is needed with regard to symptom screening detained persons re-entering jail, testing symptomatic and exposed detainees, screening staff, separating quarantine and cohort units, contact tracing, cohorting upon admission, re-testing and monitoring during cohorting, medical isolation of symptomatic detainees, social distancing, personal protective equipment, and educational information.

2. No enhanced reporting requirements and appointment of an independent

monitor to oversee compliance with the Settlement Agreement is required in light of Paragraph 19 of the Settlement Agreement and Defendant's cooperation with Plaintiffs' efforts to monitor compliance.

3. No modification of the Settlement Agreement is necessary.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a de novo Determination by the District Judge of an issue covered in this Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 19th day of November 2021.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

The Honorable William P. Dimitrouleas

All Counsel of Record