UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 20-61113-CIV-DIMITROULEAS/HUNT

CODY BARNETT, et al.,

    Plaintiffs,

v.

SHERIFF OF BROWARD COUNTY

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on Plaintiffs' Motion for an Order to Show Cause, ECF No. 181, this Court's Order Granting the Motion, ECF No. 218, and the evidentiary hearing that was held on February 3, 2023. The Honorable William P. Dimitrouleas referred the Motion to the undersigned for a report and recommendation. ECF No. 193; *see also* 28 U.S.C. § 636; S.D. Fla. L.R. Mag. R. 1. Upon thorough review of the record, applicable law, and the evidence presented at the evidentiary hearing, the undersigned RECOMMENDS that Defendant not be held in contempt for the reasons set forth below.

## BACKGROUND

Cody Barnett and other members of the class ("Plaintiffs") brought this action against Broward County Sheriff Gregory Tony ("Defendant") alleging that Defendant was exposing them to an unreasonable and unconstitutional risk of COVID-19 infection at the Broward County Jail. ECF No. 1. The Parties negotiated and executed a settlement agreement, which was approved and entered by the District Court as a

Consent Decree. ECF No. 112. As part of the Consent Decree, Defendant was required to implement a series of measures to protect Plaintiffs. ECF No. 112. The Consent Decree required Defendant's compliance with the evolving guidance from the Centers for Disease Control and Prevention ("CDC"). ECF No. 112. The Consent Decree was set to expire on May 12, 2022. ECF No. 112.

Plaintiffs moved for enforcement and modification of the Consent Decree after four months on the grounds that Defendant had failed to comply with several of the Decree's provisions. ECF No. 130. The Honorable Magistrate Judge Lurana S. Snow held an evidentiary hearing, then recommended a finding that Sheriff Tony did fail to comply with multiple provisions of the Decree. The District Court affirmed and adopted the report and recommendation in part. ECF Nos. 166, 173. The District Court entered an Enforcement Order and ordered Defendant to:

- Test all individuals for COVID-19 at intake;
- Test for COVID-19 all detainees being released or otherwise leaving the Jail, including to attend court appearances;
- Ensure that individuals in quarantine units are tested for COVID-19 every 3-7 days until testing identifies no new cases in the quarantine unit for fourteen (14) days after the most recent positive result;
- Conduct temperature and COVID-19 symptom checks prior to all transfer of detainees to different facilities;
- Maintain a list of medically vulnerable detainees and conduct COVID-19 symptom screening and temperature checks of such detainees;
- Track the housing location of medically vulnerable detainees; and
- Ensure that detainees possess two face coverings in usable condition at all times.

ECF No. 173 at 12–14.

2

The night before the Consent Decree was set to expire, Plaintiffs moved for an order to show cause as to why Defendant should not be held in contempt. Plaintiffs argued that Defendant was not only failing to comply with the Consent Decree but also the District Court's Enforcement Order. ECF No. 181. Plaintiffs requested that this Court enter an order to show cause why Defendant should not be adjudged in contempt and sanctioned for his non-compliance. ECF No. 181. This Court granted Plaintiffs' motion, ordered Defendant to respond to the Order to Show Cause, and scheduled an evidentiary hearing. ECF No. 218.

During the evidentiary hearing, both Parties presented evidence via witnesses and exhibits. ECF Nos. 247, 248. The Court ordered the Parties to submit closing trial briefs, which the Parties have done. The issue is now ripe for resolution. ECF Nos. 249, 250.

## **PARTIES' ARGUMENTS**

Plaintiffs argue that Defendant has not carried his burden of proof and should be held in contempt. Plaintiffs contend that Defendant did not provide any evidence—other than conclusory statements—that showed compliance with the Court's Order. Plaintiffs argue that Defendant, for the first time since the Consent Decree and Enforcement Order were entered, now raises an inability to comply as a defense. Plaintiffs allege that if Defendant was not able to comply, Defendant should have, pursuant to ¶21 of the Consent Decree, notified Plaintiffs' counsel of the circumstances and their impact on Defendant's ability to comply. Plaintiffs maintain that the Defendant never did so. As a remedy, Plaintiff asks the Court to extend the Decree until three months after Defendant has demonstrated full compliance. Plaintiff also requests such other remedies as the

3

Court finds appropriate, including a daily fine and closer court oversight.

Defendant contends that he has satisfied his burden and has shown that he is in substantial compliance with the Consent Decree and the Enforcement Order. In the areas where he is not in full compliance, Defendant contends that he is not willfully violating the Decree and Order; rather, Defendant asserts that he has an inability to fully comply.

As to the specific requirements of the Consent Decree and Enforcement Order, Defendant contends that all individuals are tested for COVID-19 at intake. As to testing detainees leaving the jails, Defendant maintains that due to a nationwide nursing shortage, Defendant was required to assign staff to areas of greater need. Regarding testing in quarantine units, Defendant contends that testing has been done to CDC guidelines. Defendant admits that for a time testing was not being done to the extent required by the Consent Decree and Enforcement Order. However, after notification from counsel, Defendant began to test in accordance with the requirements set forth in the Order and Decree. Defendant argues that he maintains a list of medically vulnerable detainees and tracks the housing location of medically vulnerable detainees. Lastly, Defendant asserts that face coverings have been given to detainees pursuant to the Consent Decree and Enforcement Order. Defendant asserts that pursuant to CDC November 2022 guidance, detainees are no longer required to wear masks; however, Defendant continues to provide them upon request. Thus, Defendant argues, he is in substantial compliance with the Consent Decree and the Enforcement Order.

## **ANALYSIS**

Consent decrees are enforced through the trial court's civil contempt power. *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000). "A party seeking an order

holding the defendant in contempt for violating the consent decree must 'move[ ] the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned.'"  *Peery v. City of Miami*, 977 F.3d 1061, 1077 (11th Cir. 2020) (quoting *Reynolds*, 207 F.3d at 1298).  A party seeking an order of contempt must first demonstrate by clear and convincing evidence that the "alleged contemnor violated a court's earlier order."  *Id.* (citation omitted).  "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order."  *Id.* at 1076–77 (quoting *Riccard v. Prudential Ins., Co.,* 307 F.3d 1277, 1296 (11th Cir. 2002)).  Once the moving party makes its prima facie showing, the burden then shifts to the alleged contemnor to produce evidence explaining its noncompliance at a show cause hearing.  *Id.*; *see also FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010).

The focus of a court's inquiry in civil contempt proceedings is not the subjective intent of the alleged contemnors; rather, it is whether their conduct objectively complied with the terms of the order.  *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).  Thus, alleged contemnors must do more than merely assert they did not violate the order; they must introduce evidence to support their claim.  *Chanel, Inc. v. Krispin*, No. 08-23439-CIV-TORRES, 2010 WL 482237, at *3 (S.D. Fla. 2010).

Here, the undersigned finds that Defendant should not be held in contempt. During the hearing, Defendant presented testimonial evidence and exhibits that at least partially rebutted Plaintiffs' claims and established that Defendant was in substantial compliance with the Consent Decree and Enforcement Order.  The undersigned will

5

discuss each requirement set forth in the Enforcement Order individually.

    A.  *Testing at Intake*

The Enforcement Order and Consent Decree required Defendant to test all detainees at intake for COVID-19. Defendant has designated intake to be an area of greatest need. *Id.* Defendant presented uncontroverted evidence that he is testing individuals at intake. ECF No. 248 at 57, 93. In fact, Plaintiffs' own records showed that Defendant had been testing at intake.

The undersigned finds that Defendant has met his burden and shown that he is in compliance with the requirement of testing detainees at intake. Therefore, the undersigned recommends that Defendant not be held in contempt in regard to this provision.

    B.  *Testing all Detainees Being Released or Otherwise Leaving the Jail, Including to Attend Court*

Defendant admitted that he has not tested all detainees being released or otherwise leaving the jails. Darren Sieger, the jail director, testified that testing must be done by health staff. It is therefore outsourced to WellPath—a healthcare company— and not done by jail security staff. ECF No. 244 at 59. Mr. Sieger testified that there was a time when Defendant tested inmates who were being released to a prison or a community-based program when the prison or program required it. *Id.*

Plaintiffs argue that Defendant showed he had an ability to comply with this requirement but decided to cease complying once the programs or prisons no longer required the testing. Thus, Plaintiffs contend that Defendant chose to ignore a court order and complied only with the minimum required by the receiving program.

Defendant argues that, due to a nationwide nursing shortage, WellPath was

unable to supply adequate staff to conduct the additional hundreds of tests per week, spread across four separate jail facilities, that the provision required. Dr. Pierre Dorsainvil, the jail medical director, confirmed the nursing shortage in his testimony and further testified that the health care staff was stretched thin during performance of even routine tasks. ECF No. 248 at 180. As a result, available health staff had to be assigned to areas of greater need and testing upon release was determined not to be a top priority. *See id* at 181–82.

The undersigned finds that Defendant did not fully comply with this provision of the Consent Decree or the Enforcement Order. However, the undersigned finds that Defendant did make good faith, reasonable efforts to do so, given the challenges of the nursing shortage. *See Chairs v. Burgess*, 143 F.3d 1432, 1437 (11th Cir. 1988) ("[I]nability that will absolve a party from being held in contempt requires only that the noncomplying party has made in good faith all reasonable efforts to comply with the terms of a court order."). This finding is bolstered by evidence of Defendant's substantial compliance with other terms of the Consent Decree and Enforcement Order. Therefore, the undersigned recommends that Defendant not be held in contempt for his non-compliance with this provision.

    C. *Testing Individuals in Quarantine Units for COVID-19 Every 3-7 Days Until Testing Identifies No New Cases in the Quarantine Unit for Fourteen (14) Days After the Most Recent Positive Result*

Plaintiffs contend that, according to data provided by Defendant, the combined number of people held in quarantine units, leaving jail to go to court, and going through intake exceeds the number of COVID-19 tests administered by Defendant. At the hearing, Mr. Sieger testified that individuals in quarantine units are being tested in

7

accordance with prevailing CDC guidance.  ECF No. 248 at 64.  However, Mr. Sieger acknowledged that the second round of testing in quarantine units was initially not being performed in accordance with the Consent Decree and Enforcement Order.  Mr. Sieger testified that this oversight was remedied once he was notified by counsel.  *Id.* at 65–66, 67.

Regarding the testing data, Mr. Sieger testified that while WellPath and the jail staff were doing their best, they were struggling to provide even routine clinical services during the pandemic.  *Id.* at 67–68.  Thus, although they did provide testing data, the data sometimes relied on estimates and did not reflect all the testing performed.  *Id.* at 68.  Plaintiffs counter this representation by stating that while the data may not be entirely accurate, testimony elicited during the evidentiary hearing showed that the numbers were not off by much, and that this data clearly demonstrates insufficient testing.

Here, the undersigned finds that Defendant has been in substantial compliance with the Enforcement Order and the Consent Decree in regard to testing individuals under quarantine.  During the evidentiary hearing, the undersigned asked Director Sieger specific questions regarding admittance of individuals into quarantine.  ECF No. 248 at 141.  The following discussion took place at the hearing:

> The Court: Mr. Sieger, is a unit ever put into quarantine for any reason other than the positive rapid test?  In other words, if someone has symptoms that are consistent with COVID but either hasn't been tested or tested negative -- -- are they ever put in quarantine for that reason, and then the other people in quarantine are not tested until the PCR comes back?
>
> Mr. Sieger: So, Your Honor, yes, you are correct.  If somebody has symptoms when we -- and we take them out, and we do the rapid, and it's negative ---- we don't live on the rapid as the final determining factor.  The

>   unit goes on quarantine as a prevention.  So, the unit goes in quarantine when there's a negative.  We do a PCR, and when we get the results back, that's the determining factor if the unit stays in quarantine or not.
>
>   The COURT:  All right.  So we're not necessarily talking about a false positive on a rapid test.  Sometimes a unit will go into quarantine because of symptoms or for other, some other reason, but you don't test everyone until you get a PCR back.
>
>   Mr. Sieger: The people in quarantine . . . Correct.

ECF No. 248 at 141–42.

The undersigned finds that this circumstance may explain *some* of the discrepancy between the number of individuals in quarantine and the tests being administered.  In this example, if an inmate states that he is suffering from symptoms of COVID-19, the entire unit is placed in quarantine.  But at this point, only the inmate who reported symptoms is given a PCR test.  This test result determines whether the entire unit will be tested or released from quarantine.  As a result, the number of detainees in quarantine would exceed the number of tests administered to detainees in quarantine.

But, as pointed out by Plaintiffs, this example alone cannot explain the large testing deficit reflected in the reported data.  Defendant suggests that another factor that could contribute to the disproportionate numbers is inaccurate reporting by WellPath and other jail health care staff.  The reports are generated by three shifts of nurses across four jail facilities seven days a week.  ECF No. 248 at 138.  Hundreds of people are involved in the data collecting process.  *Id.*  With this many people involved, while working in the midst of a pandemic and focusing on the inmates' health as the top priority, it is not surprising that the accuracy of the testing data might suffer.

During cross-examination regarding the inaccuracies of the testing numbers in quarantine, Mr. Sieger testified:

> I do acknowledge that there are deficiencies. My focus primarily, I mean, in terms of what we do day-to-day is to give the inmate population the best care. And I know what we actually do. And I know that we are testing the people that are in quarantine that need testing. I know that we test people that come into booking, prebooking. And I do know that we retest people that are in quarantine if we get a positive from the original round of testing.

ECF No. 248 at 136–37.

The undersigned acknowledges that the testing numbers do raise some questions. But the officials who are most familiar with what is going on within the jail facilities stated, under penalty of perjury, that they are testing—while perhaps not accurately reporting—individuals in quarantine in accordance with the Consent Decree, the Enforcement Order, and CDC guidelines. Therefore, the undersigned finds that Defendant has met his burden and shown that he has been in substantial compliance with the Enforcement Order, Consent Decree, and CDC guidelines in regard to testing individuals in quarantine.

D. *Provisions Regarding Medically Vulnerable Detainees*

Plaintiffs argue that contempt is appropriate as to this provision because Defendant admitted to not conducting COVID-19 symptom screening and temperature checks of medically vulnerable detainees. Defendant first responds that Plaintiffs have not challenged that Defendant maintains a list of those medically vulnerable detainees and tracks the housing location of the medically vulnerable detainees. Testimony provided by Mr. Sieger and Dr. Dorsainvil confirmed the lists, demonstrating that Defendant satisfied his burden as to these provisions of the Consent Decree and Enforcement Order.

In regard to testing medically vulnerable detainees twice a day, Defendant once again contends that the nursing shortage caused Defendant to prioritize allocation of

resources and to assign health staff to areas of greater need. Defendant contends, however, that other measures were established to tend to the medically vulnerable detainees. For example, "Director Sieger testified that BSO/Wellpath utilizes sick call; two and three times daily medical visits to each unit; 30-minute, 24 hour per day, 7 day per week rounds through each unit; and inmate self-reporting to monitor the threat of COVID to medically vulnerable detainees. Director Sieger testified that BSO/Wellpath symptom-checks the medically vulnerable detainees most at-risk in the Jail—those in isolation units, quarantine units, observation units, and the infirmary—at least twice per day." ECF No. 249 at 7.

Here, the undersigned finds that Defendant is in substantial compliance with the Enforcement Order and the Consent Decree in regard to the provisions related to medically vulnerable detainees. Defendant has admitted that he is not fully complying with the testing requirements but has put adequate safeguards in place to protect these detainees without overburdening jail health staff. Thus, the undersigned recommends that Defendant not be held in contempt in regard to these provisions.

E. *Detainees Possess Two Face Coverings in Usable Conditions at all Times*

Plaintiffs contend that Defendant is failing to provide detainees with two face coverings. Plaintiffs argue that detainees have provided evidence that they are not offered or given replacements on request even though Defendant claims the opposite. During the hearing, Plaintiffs produced Mr. Damar Pink, a detainee in a jail facility in Broward County, who testified that he has only been given a cloth face covering, which he has to hand wash repeatedly; that he only received a disposable paper mask for his court appearance at the show cause hearing; that he was only provided masks five

times in all of 2022; and that no one housed in his unit currently has a mask except him. ECF No. 248 at 11–19.

Defendant responds that he provided evidence from Mr. Sieger, who testified that at all times while prevailing CDC guidance required detainees to wear masks, Defendant provided two masks to detainees. *Id.* at 97–98. Mr. Sieger testified that replacement masks are always available. Lastly, Mr. Sieger testified that as of November 2022, CDC guidance no longer requires detainees to wear masks but that masks remain available to any detainee who desires one, upon the detainee's request.

Here, again, the undersigned finds that Defendant has met his burden to show that he is in substantial compliance with the Court's Enforcement Order, the Consent Decree, and the current CDC guidance regarding this provision. Defendant provided testimony from its Director that they had a substantial supply of face masks and gave them to detainees upon request. Further, the CDC no longer requires detainees to wear face coverings. Thus, even if Defendant did not meet his burden, the undersigned would find it difficult to find him in contempt over a safety provision that is no longer required by the CDC. Therefore, the undersigned recommends that Defendant should not be held in contempt in regard to the face covering provision.

F. *Conclusion*

Plaintiffs' initial reaction to this report and recommendation will likely be disappointment. But Plaintiffs did not lose this case. Ultimately this lawsuit has achieved a good result for the inmates of Broward County Jail, and therefore for the citizens of Broward County. The Enforcement Order and Consent Decree, by the terms of the agreement, have now been in place for a full year longer than originally

requested. Plaintiffs may feel that they have not been given the full benefit of their bargain as Defendant has fallen short of full compliance with some of the terms of the agreement. But it is undeniable that significant safeguards were implemented for the protection of detainees due to this litigation. At least in part due to Plaintiffs' efforts, serious illnesses were undoubtedly prevented, and lives were almost certainly saved.

During argument over this motion, defense counsel conceded that the ACLU was acting with good public motive and doing very good work. Nevertheless, counsel expressed concern that "once they get their hands into something, they want to keep them in." ECF No. 225 at 41. Counsel further cited Judge Dimitrouleas' purported concern that "this agreement could go on in perpetuity." *Id.* at 45. The undersigned sees no evidence that Plaintiffs seek to prolong this agreement unnecessarily. But defense counsel's underlying point is sound. Judicial oversight of state agencies is sometimes necessary. Permanent judicial oversight is almost always a bad idea.

Importantly, defense witnesses testified that Broward County Jail will continue to use the practices established as a result of this litigation, including adhering to prevailing CDC guidance, with the goal of protecting the detainees as well as jail staff. *See* ECF No. 248 at 195 (Dr. Dorsainvil testified, "I don't need a decree; I don't need anything. I will continue to take care of those patients."). Defendant's stated commitment to continuing the practices established as result of this litigation is bolstered by the results Defendant has achieved since the beginning of the COVID-19 pandemic. For example, defense witness testimony shows that there have been only three COVID-related inmate deaths since the inception of the pandemic, and none since

the Consent Decree has been in place.[1]  *Id.* at 193.  There have been no outbreaks of COVID-19 in Broward County Jail that exceeded the levels in the surrounding community, and no medically vulnerable detainees have been hospitalized due to COVID-19 during the life span of the Consent Decree.  *Id.*  Finally, the COVID-19 emergency, as of April 10, 2023, has been declared over by President Biden.[2]

Taking all circumstances into account, and in consideration of all the evidence submitted by the Parties, the undersigned finds that Defendant has been in substantial compliance with the Enforcement Order and the Consent Decree as well as the evolving CDC guidance.

## RECOMMENDATION

Based on the foregoing, the undersigned RECOMMENDS that Plaintiffs' request that Defendant be held in contempt be **DENIED**, and that the Consent Decree be terminated.

---

1.   For context, the New York Times found, after a comprehensive national study, that "[d]eaths in state and federal prisons across America rose nearly 50 percent during the first year of the pandemic . . . more than twice the increase in the United States overall."  More specifically, "at least 6,182 people died in American prisons in 2020, compared with 4,240 the previous year, even as the country's prison population declined."  Allie Pitchon & Jennifer Valentino, *As the Pandemic Swept America, Deaths in Prisons Rose Nearly 50 Percent*, THE NEW YORK TIMES, (February 19, 2023) https://www.nytimes.com/2023/02/19/us/covid-prison-deaths.html.

2.   Kathryn Watson, *Biden Signs Bill Ending COVID-19 National Emergency*, CBS NEWS: POLITICS, (April 10, 2023, 6:02 p.m.), https://www.cbsnews.com/news/biden-signs-bill-ending-covid-19-national-emergency.

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(b). The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3–1 (2016); *see Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** at Fort Lauderdale, Florida this 18th day of May 2023.

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Honorable William P. Dimitrouleas

All Counsel of Record